UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

JOHN DOE,

                                    Plaintiff,

      -vs-

UNITED STATES MERCHANT MARINE
ACADEMY, JAMES A. HELIS, individually and as
Superintendent of the United States Merchant Marine
Academy, the UNITED STATES MARITIME
ADMINISTRATION, the UNITED STATES
DEPARTMENT OF TRANSPORTATION, and the
UNITED STATES OF AMERICA,

                             Defendants.

-------------------------------------------------------------------X

Case No.:  18-cv- ★

**COMPLAINT**

**CV-18 1870**

**BIANCO, J.**

**TOMLINSON, M.J.**

**RECEIVED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 28 2018 ★

LONG ISLAND OFFICE

Plaintiff, John Doe ("Doe"), by his attorneys, Gerald B. Lefcourt, P.C., as and for his Complaint against defendants United States Merchant Marine Academy (the "Academy"); James A. Helis, individually and in his capacity as Superintendent of the United States Merchant Marine Academy; the United States Department of Transportation; and the United States of America (collectively "Defendants"), alleges the following:

## SUMMARY OF THE CLAIMS

1.      This is an action for declaratory, injunctive and equitable relief and monetary damages for Defendants' conduct in improperly and unlawfully suspending Plaintiff from the United States Merchant Marine Academy, thereby barring him from completing his final term and prohibiting him from graduating with the United States Merchant Marine Academy's Class of 2018, all of which action is premised on a finding that Plaintiff violated Superintendent Instruction 2016-12 and ¶ 243(a) of the Midshipman Regulations following false allegations of

sexual assault and an adjudicative procedure that neither followed the Academy's rules, regulations, policies and procedures nor, even if it had, would still be unlawful because the procedure lacked due process.

2.     The stakes are high for any college student accused of misconduct. Those stakes are even higher for someone accused of sexual misconduct. In the #metoo era, there is often a rush to judgment followed by a flawed investigative and adjudicative procedure that presumes guilt and requires the accused to prove his innocence. That is exactly what happened here.

3.     Institutions of higher learning, however, are not exempt from the Constitution and the commands of due process, certainly not those operated and maintained by the federal government. Due process is the cornerstone of justice and serves as a check on overzealous government administration while protecting individuals against unfettered deprivation of their protected interests.

4.     This case illustrates the dangers of a rush to judgment, presumption of guilt, and failure to provide a fundamentally fair and just system to adjudicate student disciplinary matters.

5.     Plaintiff, a 22-year-old student mariner with no legal background, was forced to defend himself in a grueling adjudicatory process that saw Defendant James A. Helis, the school's Superintendent ("Helis" or the "Superintendent"), serving as prosecutor seeking a conviction, the "neutral judge", the jury with an open mind, and the appellate panel asked to review the findings and punishment imposed. That such a process would fail to provide even the rudiments of due process should be obvious. Yet objection after objection were summarily dismissed without explanation.

6.     The Superintendent's fundamental conflicts and inherent bias was borne out time and again. It was evident when he determined he would call only those witnesses whom he

2

concluded would support a finding of guilt. It was evident when he prohibited Plaintiff from cross-examining the accuser in contravention of the written school policy for the conduct of such hearings. It was evident from his preclusion of Plaintiff from developing through other witnesses, facts from which the credibility of both the accuser and her new boyfriend and chief supporter could be evaluated. It was evident from the presumption of "facts" that were contrary to the testimony at the hearing. And it was evident from the prosecutor's/judge's/jurors' hostility towards Plaintiff while acting deferentially towards the accuser; refusal to employ the school's own policies and procedures; reliance on evidence not presented at the hearing; failure to apply the school's definition of consent; and refusal to apply the law – just to name a few.

7.     These obvious infirmities were only compounded by the fact that during the course of the nearly 12-hour one-day hearing Plaintiff was forced to serve as his own attorney and examine and cross-examine ten witnesses, present documentary evidence, make legal arguments, raise objections, and then testify on his own behalf, subjecting himself to vicious cross-examination the likes of which his accuser did not experience.

8.     And, after Plaintiff was found guilty by the Superintendent – without any factual basis or findings – and suspended for what amounts to one year, the same prosecutor/judge/jury assumed the role of an "appellate panel", reviewing his own decisions. The Academy's procedures here are both unlawful *per se* and as applied to Plaintiff.

## JURISDICTION AND VENUE

9.     This action arises under the Due Process Clause of the Fifth Amendment to the United States Constitution; the Equal Protection Clause of the 14th Amendment to United States Constitution; the Administrative Procedures Act; and *Bivens v. Six Unknown Federal Bureau of Narcotics Agents*, 403 U.S. 388 (1971).

3

10.     This Court has jurisdiction over this action pursuant to 5 U.S.C. §701 et seq. (Review of Actions by Administrative Agencies); 28 U.S.C. §1331 (federal question); 28 U.S.C. § 1332 (diversity of citizenship); 28 U.S.C. §1346 (United States as a defendant); 28 U.S.C. §2201 (declaratory judgment); and 28 U.S.C. §2202 (injunctive relief).

11.     Venue is properly established in the Eastern District of New York pursuant to 28 U.S.C. §1391(b) and (e) as the acts complained of occurred in and some of the Defendants reside in the Eastern District of New York.

## JURY DEMAND

12.     Plaintiff demands a trial by jury in this action on each and every one of his claims for which he is entitled to a jury.

## THE PARTIES

13.     During all events described herein Plaintiff was a student at the Academy and resided on the Academy's campus in Kings Point, New York.

14.     Plaintiff was admitted to the Academy Class of 2018 and began as a midshipman in or around June 2014.  Plaintiff is a native of Michigan and was scheduled to graduate the Academy in June 2018 and at the time the setback was imposed, had only eight weeks remaining to complete his requirements for graduation.  As a result of the determinations made against him, however, as of March 23, 2018, he is on a "leave of absence" from the Academy.  He is prohibited from returning to the Academy until the start of the third term of the 2018-2019 year, which is scheduled to begin March 12, 2019.

15.     At all times set forth herein, upon information and belief, Defendant United States Merchant Marine Academy, is a United States agency, operated by the United States Maritime Administration ("MARAD"), and funded by United States Department of Transportation

4

("DOT"). The Academy operates as a federal service academy charged with the responsibility of educating and graduating licensed Merchant Marine officers. The Academy is located at 300 Steamboat Road, Kings Point, New York, within the Eastern District of New York.

16.     At all times set forth herein, upon information and belief, Defendant James A. Helis is the Superintendent of the Academy and resides within the Eastern District of New York.

17.     At all times set forth herein, upon information and belief, Defendant United States Maritime Administration is an administration within DOT and administers financial programs to develop, promote, and operate the U.S. Maritime Service and the United States Merchant Marine. It is an agency of the United States of America, located at the West Building, 1200 New Jersey Avenue, SE, Washington, D.C, and operates and administers the Academy.

18.     At all times set forth herein, upon information and belief, Defendant United States Department of Transportation is a Federal Cabinet Department of the United States government concerned with transportation, including but not limited to, maritime transportation. It is an agency of the United States of America, located at the West Building, 1200 New Jersey Avenue, SE, Washington, D.C. Upon information and belief, DOT, operates, funds and/or maintains the Academy, located in Kings Point, New York.

## FACTS COMMON TO ALL CLAIMS

19.     It is an Academy tradition that in August of their senior year, midshipmen receive their class rings during a formal ceremony at the Academy. To celebrate this milestone, the Academy hosts a celebration, called the Ring Dance, (the "Dance") usually held at an event venue in New York City.

20.     The Dance is not unlike a college formal or high school prom with dancing and refreshments. Midshipmen usually attend with dates. There is also a Ring Dipping Ceremony,

5

during which a midshipman's date dips the newly awarded ring in sea water and then wears it around his or her neck on a chain for some period thereafter. Traditionally, midshipmen kiss their dates at the conclusion of the Ceremony.

21.     Because the Dance is held in Manhattan and the Academy is located on Long Island, many midshipmen stay in hotels near the Dance the night after the Dance rather than return to their barracks on Long Island.

22.     The Class of 2018's Ring Dance was held on August 12, 2017, at Capitale, an event venue located on the Bowery in New York City.

23.     Plaintiff planned to attend the Ring Dance and purchased tickets. However, he did not have a date for the Dance. A fellow midshipman and then-friend (the "Friend") offered to set-up Plaintiff with the sister of his Ring Dance date. Plaintiff agreed.

24.     The proposed date was not at the time and had never been a student at the Academy. In the course of arranging the date, the Friend told Plaintiff that the young woman was "hotter" than her sister, the Friend's actual date. The Friend also conveyed his own desire to have a sexual relationship with her, that is, the sister of his own date.

25.     The Friend had arranged to stay in a hotel the night before the Dance, as well. Plaintiff met his date (the "Complainant") for the first time on August 11, 2017, the evening before the Dance. Complainant and her sister were staying in the room rented by the Friend and Plaintiff met them at a midtown rooftop bar. Plaintiff and Complainant spent time together the evening before the Dance, during which time they consumed alcoholic beverages.

26.     Some time that evening, that is, before the Dance, Plaintiff returned to the Academy for the night. Upon information and belief, the Complainant, her sister, and the Friend slept in the same room at a hotel the night before the Dance.

27.     On the day of the Dance, Plaintiff returned to Manhattan and checked into a room at the same hotel where the Friend, his date and the Complainant were spending the night after the Dance, it was a different hotel than where they had stayed the previous night. Plaintiff left his bags and went with a fellow midshipman to Little Italy for lunch. On his way back to the hotel, Plaintiff purchased flowers for the Complainant.

28.     Upon returning to the hotel, Plaintiff dropped his bag in his room and then went to the room of the Friend, the Complainant and her sister. Other midshipmen had already gathered there, as well.

29.     The Friend asked Plaintiff to accompany him to purchase wine. Plaintiff agreed and they went together. Upon returning to the room, Plaintiff consumed a small amount of wine. The Complainant did not drink with Plaintiff.

30.     Plaintiff then returned to his own room to change into his uniform and retrieve the flowers he purchased for the Complainant. He returned to the Friend's room, gave the Complainant the flowers, consumed another small amount of wine, and took pictures with his date and the other midshipman who had gathered there with their dates. There were as many as 20 people in the room at the time.

31.     At approximately 7 p.m., Plaintiff, the Complainant, her sister, the Friend, and the others present walked to the Ring Dance venue.

32.     At the venue, Plaintiff and the Complainant each presented photo identification to demonstrate they were at least 21 years old. Each was given a bracelet that entitled them to free alcoholic beverages during the Dance.

33.     At the time of the Ring Dance, the Complainant was not in fact 21 years of age, but rather, 18 years old. Complainant used a fake ID she had purchased with the help of the

7

Friend from a female midshipman at the Academy. Plaintiff played no role in securing the ID for Complainant.

34. Plaintiff and the Complainant then spent the next several hours at the Ring Dance, eating, drinking alcoholic beverages, dancing, and enjoying each other's company. They also participated in the traditional Ring Dipping Ceremony at the end of which, Plaintiff, at the behest of his fellow midshipman, kissed Complainant politely and respectfully on the cheek.

35. Towards the latter part of the Ring Dance, Plaintiff and the Complainant were seen dancing with each other provocatively and kissing. It was the Complainant who initiated the kissing. No one who saw them, including the Friend and, upon information and belief, Complainant's sister, tried to stop Plaintiff and Complainant from kissing or dancing.

36. Plaintiff and the Complainant remained at the Ring Dance until it was over at or about 11:30 p.m. They then walked back to the hotel with the Complainant's sister, the Friend, and several other midshipmen and their dates. The Complainant walked the several blocks from the Ring Dance venue back to the hotel in high heels without tripping or falling and did not appear to be unsteady on her feet.

37. A number of midshipmen and their dates gathered in the Friend's room, which had a large balcony. Plaintiff and the Complainant were amongst those gathered, as was the Complainant's sister and her date, the Friend.

38. Plaintiff and the Complainant spent time together on the balcony talking and flirting. They were not drinking. Neither the Friend nor Complainant's sister were with them while they were on the balcony, although others were present on the balcony. As the night wound down and it was time to go to bed, the Complainant told her sister and the Friend that she intended to sleep in Plaintiff's room. Plaintiff was not a participant in these discussions.

8

39.     The Complainant's sister and the Friend expressed to the Complainant dissatisfaction with her choice. However, neither of them, nor anyone else in the room, took any steps to prevent or prevented the Complainant from going with Plaintiff to his room.

40.     Before they left, however, the Friend instructed Plaintiff not to engage in sexual intercourse with the Complainant, claiming she was too intoxicated. Plaintiff had not intended to engage in sexual intercourse with the Complainant, so he agreed and left.

41.     The Complainant took her suitcase and accompanied Plaintiff to his room. She went to his room of her own free will and on her own power, bringing along her suitcase.

42.     Almost immediately upon entering Plaintiff's room, the Complainant started kissing Plaintiff and then initiated sexual contact with him.

43.     The Complainant made it clear through her words and actions she wanted to engage in sexual intercourse with Plaintiff, was consenting to engage in sexual intercourse with him, and had the mental capacity to consent, including without limitation by telling Plaintiff to put on a condom.

44.     Plaintiff did not anticipate having sexual intercourse with the Complainant and did not have a condom. However, the hotel had a kit in the room available for purchase that included a condom and so, at the Complainant's behest, the Plaintiff purchased it.

45.     Plaintiff and the Complainant then had sexual intercourse. Later that same night, Complainant initiated a second sexual encounter by positioning herself on top of Plaintiff. Again, through her words and actions Complainant made it clear to Plaintiff that she wanted to engage in sexual intercourse with him, was consenting to engage in sexual intercourse with him and had the mental capacity to consent.

9

46.     After the second sexual encounter ended, the Complainant changed into sleep clothes and went to sleep in the same bed with Plaintiff.

47.     When they woke up in the morning Complainant and Plaintiff stayed in bed together for a while talking and cuddling.  While still in bed, Complainant also added herself as a "friend" to Plaintiff's Snapchat account.

48.     Thereafter, the Friend texted to say he needed assistance tidying the balcony.  The Complainant joked that she did not want to clean up the balcony, claiming she would be sick if she had to and Plaintiff texted the Friend to that effect.  Nevertheless, Complainant and Plaintiff decided to get ready to return to the suite.

49.     Unbeknownst to Plaintiff, Complainant relayed the events of the evening to her sister by text.  The Complainant gave Plaintiff no reason to think that she was upset about her encounter with him.  On the contrary, she had added herself to his Snapchat account and told him she had had a good time.  Later she hugged him goodbye.

50.     Within a few minutes, Plaintiff received a text from the Friend indicating that the Friend knew that Plaintiff and Complainant had had sex.  Later that night at the Academy, the Friend accused Plaintiff of sexually assaulting the Complainant, claiming Complainant was too intoxicated to consent to having sex.

51.     Upon information and belief, over the course of the next several weeks the Complainant and the Friend became close and started dating.  Several months later, the Complainant contacted Plaintiff twice and inquired as to what happened the night of the Ring Dance, claiming she did not remember.  Those telephone calls were arranged and recorded by law enforcement.

10

52.     In or about October 2017, the Complainant's mother contacted law enforcement and wanted the Complainant to file charges. Upon information and belief, the Complainant was adamant that she did not want to file charges against Plaintiff but was pressured by her mother and others to do so. However, the Friend - the Complainant's new boyfriend - pressured and convinced her to file a complaint with the Academy.

**The Investigation**

53.     The Academy was notified in or about October 2017, two months after the events, that the Complainant alleged to have been sexually assaulted by Plaintiff the night of August 12/13, following the Ring Dance.

54.     The allegations were first reported to the regimental Sexual Assault Victim Advocate Petty Officer, a midshipman at the Academy, by the Friend.

55.     The Sexual Assault Victim Advocate Petty Officer referred the Friend to the Academy's Sexual Assault Prevention and Response Program Manager, an Academy employee, who then contacted Jeffrey Thomas, of the Academy's Department of Public Safety and provided him with the contact information for the Complainant's mother.

56.     Thereafter, Mr. Thomas, contacted the Complainant's mother who provided a brief description of the purported allegations and advised that the matter had been reported to law enforcement.

57.     On or about November 1, 2017, Mr. Thomas met with a detective of the New York City Police Department (the "Detective") assigned to investigate the complaint and a Special Agent from the Department of Transportation Inspector General's Office.

58.     On or about November 1, 2017, Mr. Thomas contacted the Complainant's mother to coordinate an interview of the Complainant. Instead of submitting to an interview, on or about

11

November 3, 2017, the Complainant's mother submitted a written statement purportedly from the Complainant via electronic mail – it was unsigned and unsworn.

59.     On or about November 9, 2017, Mr. Thomas conducted a telephonic interview with the Complainant.  Mr. Thomas did not go through the entirety of the Complainant's allegations, but instead, asked follow-up questions.  This was the only time Mr. Thomas spoke with the Complainant.

60.     Also on or about November 9, 2017, Mr. Thomas was contacted by the Detective who advised Mr. Thomas that the Complainant and her mother had contacted him about pursuing criminal charges against Plaintiff.  The Detective then requested that Mr. Thomas not interview Plaintiff until he had a chance to speak with Plaintiff.

61.     On or about November 13, 2017, the Detective visited the Academy to conduct an interview of Plaintiff.  The interview took place at or about 3:30 p.m. and Mr. Thomas was present throughout.  The Plaintiff was not advised that the Academy was conducting its own investigation.

62.     Plaintiff was read his *Miranda* warnings by the Detective, but waived his right to remain silent and voluntarily submitted to an interview by the Detective.  He was not accompanied by and had not consulted counsel, an advisor, or his parents.  Plaintiff answered all questions posed to him and was honest and forthright during the interview.

63.     Plaintiff never wavered as to what occurred on the night in question, always insisting that the Complainant was a willing, active and consenting participant in all sexual activity, and at times was the aggressor, even asking Plaintiff to get and put on a condom and positioning herself on top of him to initiate sex.

12

64.     Plaintiff also never wavered as to the fact that the Complainant was not too

intoxicated to consent to engage in sexual intercourse with Plaintiff, had the mental capacity to

give her consent to do so, and had in fact consented to all sexual activity.

**The Notice of Disciplinary Charges**

65.     It was several months before the Plaintiff heard anything else from the Academy.

Then, on or about January 10, 2018, five months after the events in question are alleged to have

occurred and two months after the Academy initiated its investigation, Plaintiff was given notice

that the Academy was charging him with violating Superintendent Instruction 2016-02, Sexual

Assault, Dating Violence, Domestic Violence, Stalking, Prevention Education, and Response

Policy, and ¶s 243(a) and (b) by sexually assaulting his date to the Academy's Ring Dance at a

hotel in New York City following the dance (the "Notice"). It incorrectly noted the date of

occurrence was on or about October 12th and/or 13th.

66.     Superintendent Instruction 2016-02 defines "sexual assault" as:

> **Sexual assault** is a crime of violence defined as intentional touching
> of a sexual nature against the will (by use of force, physical threat,
> or abuse of authority) or without the consent of the victim...

67.     Superintendent Instruction 2016-02 includes a non-exhaustive list of conduct

which constitutes sexual assault. It provides:

> Sexual assault includes, but is not limited to, the following:
>
> i) Unwanted kissing, groping, fondling, or other more aggressive
> physical acts, such as rape, nonconsensual sodomy (oral or anal
> sex), or attempts to commit these acts;
>
> ii) Sexual contact with someone whom you reasonably should have
> known was impaired and, thus unable to consent, due to the use of
> alcohol or drugs (including prescription medications);
>
> iii) Sexual contact with someone who is "passed out," sleeping, or
> otherwise incapacitated;

13

> iv) Sexual contact with someone who is unable to say "no" and/or change their mind due to the presence of coercion or intimidation; and
>
> v) Sexual contact with someone who is under the age of consent in the jurisdiction in which the sexual assault occurs.

68.     Superintendent Instruction 2016-02 defines "consent" as:

> e) **Consent** is an affirmative decision to engage in mutually agreed upon sexual activity and is given by clear words or actions. Consent may not be inferred from silence, passivity or lack of resistance alone. Consent to one form of sexual activity does not imply consent to other forms of sexual activity, and the existence of a current or previous dating or sexual relationship is not sufficient to constitute consent to additional sexual activity. Assent shall not constitute consent if it is given by a person who is unable to *lawfully* give his or her consent because of youth, disability, intoxication or other condition, or coercion or intimidation.

(emphasis supplied).

69.     The Notice stated that Plaintiff also was being charged with violating ¶ 204(f) of the Midshipman Regulations by failing to prevent the woman, who was underage, from drinking unlawfully or irresponsibly.

70.     Plaintiff was directed to appear for a Superintendent's Disciplinary Hearing (the "Hearing") on January 19, 2018.

71.     The Notice included a list of eleven witnesses which the Academy *may* call as witnesses at the Hearing. It also contained a list of Plaintiff's rights prior to and at the hearing, including without limitation were the rights:

- To receive, with the written notice, copies of all documentation to be considered by the Superintendent in making his decision, subject to you signing a Confidentiality/Non-Disclosure Agreement. (With your consent, your advisor and/or counsel may receive a copy of the relevant documentation, likewise subject to execution of a confidentiality/Non-Disclosure Agreement.)

- To seek advice and assistance of legal counsel in the preparation of your case at your own expense. Your counsel may be present at the hearing to consult and advise you, but may not otherwise participate in the proceedings.

14

- To request any Academy faculty or staff member other than a Chaplain, Counsel to the Academy, member of the Commandant's Office, or witness to be called at the hearing to act as your advisor as long as serving in that capacity does not present a conflict with the faculty or staff member's professional responsibilities. In the event that you are unable to obtain an advisor, the Superintendent will appoint one on request.

- To present evidence including but not limited to documentary evidence and the testimony of reasonably available witnesses during each phase of the hearing. You must notify … in the Superintendent's Office, … of the identify of your witnesses. The Academy shall make reasonable efforts to insure the attendance of the witnesses identified by you who are enrolled at or employed by the Academy. Appearance by witnesses not employed by, or enrolled at, the Academy are your sole responsibility.

- To question all witnesses, whether called by the Academy or by you, except for the Complainant .... You may, however, submit written questions for [the Complainant] to the Superintendent, who shall review the questions and ask those questions relevant to the proceedings.

72. Included with the Notice was a list of the "Procedures for Superintendent's Disciplinary Hearing in the Case of Sexual Assault/Harassment"; the Academy's "Investigation Report" dated November 27, 2017; Plaintiff's Academic File and Transcript; Plaintiff's Company File and Midshipman Profile; Plaintiff's Personnel Jacket; and Plaintiff's Sea Year File. Removed from the Investigation Report were all references to the names of witnesses, with the exception of Plaintiff and the Complainant.

73. Plaintiff was expressly prohibited from providing a copy of the Notice and the accompanying documents to his counsel.

74. Although the "Procedures for Superintendent's Disciplinary Hearing in the Case of Sexual Assault/Harassment" ("SA/SH Procedures") state that they were adopted on June 12, 2014, these SA/SH Procedures are not included or referenced in the Midshipman Regulations. Nor, upon information and belief, are they available online as are the Midshipman Regulations and Superintendent Instruction 2016-02.

15

75.     The SA/SH Procedures include a list of the "Rights of Respondent". Included among them are the unfettered right:

- To present evidence including but not limited to documentary evidence and the testimony of reasonably available witnesses during each phase of the hearing (determination whether violation occurred and penalty phase, if necessary)...

- To question all witnesses, whether called by the Academy or by Respondent.

76.     The SA/SH Procedures did not authorize the Academy to prohibit Plaintiff from questioning the Complainant. Nor, did it authorize the Academy to prohibit Plaintiff from calling witnesses whose identities were provided in a timely manner.

77.     Neither the SA/SH Procedures nor Superintendent Instruction 2016-02 include the standard of proof to be applied when considering the charges and the Superintendent never articulated the standard he would apply.

78.     On or about January 10, 2018, Plaintiff's counsel made a formal request to the Superintendent's office for a copy of the Notice. On or about January 11, 2018, having received no response, Plaintiff's counsel contacted Counsel to the Academy, again seeking a copy of the Notice.

79.     On the same day, Plaintiff's counsel notified the Academy that earlier that morning, counsel had been notified by law enforcement, which had been investigating the allegations, that Plaintiff had been cleared of any criminal wrongdoing and the law enforcement investigation had been closed without any charges being filed against Plaintiff. In other words, upon information and belief, law enforcement had concluded that the evidence demonstrated the Complainant was *lawfully* able to and had consented to engage in sexual activity with Plaintiff. Counsel argued that for that reason alone, the Hearing should not proceed.

16

80.     Plaintiff's counsel also requested a 60-day adjournment to review the Academy's file, all other relevant materials, and the Academy's rules, regulations, policies, protocols, and procedures; to consult with Plaintiff; to conduct a further investigation of the matter; and to properly prepare for the Hearing.

81.     In response, Plaintiff's counsel was provided with a confidentiality agreement which he was required to sign as a precondition to receiving the Academy's Investigation file, along with a copy of the applicable policies under which Plaintiff was charged.

82.     Counsel for the Academy stated that the decision of law enforcement had "no impact" on and did not "inform" the Academy's disciplinary proceedings since Plaintiff was being charged with violations of the Academy's "policies, not for a criminal act".

83.     Plaintiff's request for a 60-day adjournment was denied.  As a compromise, Plaintiff's counsel proposed a 30-day adjournment.

84.     On or about January 12, 2018, Plaintiff's counsel was provided with a copy of the Notice, in redacted form.

85.     On or about January 16, 2018, Plaintiff was notified that the Superintendent's Hearing was adjourned for one week to January 26, 2018.  According to the Academy, the one week adjournment was "sufficient time … to prepare for the hearing".

86.     A Revised Notice of Hearing dated January 17, 2018 ("Revised Notice") was issued advising of the new Hearing date.

87.     On January 23, 2018, three days before the scheduled hearing, Plaintiff finally secured a faculty advisor willing to assist him at the Hearing.

88.     Plaintiff's advisor had never before served in this role and the Academy provided him with no training or guidance to serve in this role.

17

89.     On January 24, 2018, Plaintiff's counsel was notified that the Notice and Revised Notice contained the wrong date of occurrence, October 12th and/or 13th instead of August 12th and/or 13th, and therefore, the hearing would be adjourned to February 9, 2018.

90.     On January 25, 2018, a Second Revised Notice of Hearing ("Second Revised Notice") was issued to Plaintiff notifying him of the new Hearing date.

91.     On or about January 26, 2018, Plaintiff's faculty advisor raised due process concerns with the Academy as to the SA/SH Procedures.  Included among them were (a) prohibiting Plaintiff from cross-examining the Complainant in direct contravention of the SA/SH Procedures; (b) unexplained redactions in the Investigation File; (c) affording the Complainant the right to be present throughout the proceedings and to have an advisor contrary to all other witnesses who were not provided with such rights and those rights were not provided for in the SA/SH Procedures; (d) affording the Complainant an opportunity to make a victim impact statement which is not provided for by the SA/SH Procedures; and (e) inconsistencies between the rights and protocols set forth in the Hearing Notice and those in the SA/SH Procedures.

92.     On or about January 29, 2018, Plaintiff's faculty advisor formally lodged objections with respect to the Superintendent's decision to utilize procedures cobbled together from differing policies and protocols, at his discretion.  This included an objection to the Academy holding a Superintendent's Hearing under SA/SH as opposed to an Executive Board ("E-Board") Hearing under the Midshipman Regulations.

93.     In addition, the faculty advisor demanded that the Academy comply fully with its policies and procedures.  Specifically, demand was made for:

- The Complainant to be treated like all other witnesses and permitted only to attend the hearing while being questioned, and appear without an advisor;

18

- Plaintiff to be free to question the Complainant directly, like any other witness;

- The Complainant not to be allowed to deliver a victim impact statement in the event the Hearing entails a Phase II (penalty phase).

94. On or about January 30, 2018, these requests were denied.

95. On or about January 31, 2018, the Academy advised Plaintiff that at the Hearing, the Superintendent only intended to call four of the eleven witnesses identified in the Notice, Revised Notice, and Second Revised Notice. The Superintendent reserved the right to call any of the other witnesses if, during the course of the Hearing, he determined their testimony was necessary.

96. Later that same day, Plaintiff's faculty advisor objected to the Superintendent's decision to limit the witnesses he called to the four identified since by doing so the Superintendent was calling only those witnesses who he believed supported a finding of guilt as to the charges leveled against Plaintiff.

97. Plaintiff's faculty advisor also raised concerns about the Superintendent's dual role at the Hearing as prosecutor on behalf of the Academy and "impartial" judge, *i.e.* fact finder. The Academy was put on notice that the Superintendent's dual role constituted an inherent conflict of interest and was in violation of the Superintendent Instruction 2016-02 which provided Plaintiff with the "right to an investigation and disciplinary process conducted in a manner that ... is not conducted by individuals with a conflict of interest".

98. On February 8, 2018, counsel for Plaintiff submitted an 11-page letter objecting to the policies, procedures and protocols being utilized by the Academy on the grounds that they are fundamentally unfair and failed to provide sufficient due process. These objections included without limitation:

- Proceeding with the Hearing in the face of a law enforcement determination that there was no probable cause to believe Plaintiff engaged in non-consensual sexual activity or contact with the Complainant;

- Proceeding by way of a Superintendent's Disciplinary Hearing under the SA/SH Procedures instead of an Executive Board;

- The Superintendent's conflicting roles as "advocate" for the Academy, "neutral judge" presiding over the proceedings, and "jury" determining the facts;

- Prohibiting counsels right to participate in the Hearing;

- Prohibiting counsel's presence in the Hearing room;

- The Complainant's presence in the Hearing room throughout the proceedings;

- Prohibiting Plaintiff from directly questioning the Complainant;

- The Superintendent's decision not to call exculpatory witnesses;

- Consideration by the Superintendent of unsworn statements contained in the investigation report;

- Consideration of photographs of purported bruises to the Complainant's legs;

- The Superintendent's access of the entire investigation report;

- The Academy's failure to obtain critical evidence during the investigation;

- The failure of statements in the investigation report to be in the first person as required by Academy rules and regulations;

- The failure to provide Plaintiff with the training records of those who investigated and adjudicated the charges against him;

- Restrictions imposed on Plaintiff as to the use and disclosure of the contents of the investigation file.

**The Hearing**

*Phase I*

99.     The Superintendent convened the Hearing on Friday, February 9, 2018, just after 10:00 a.m.  It continued until shortly before 10:00 p.m., with brief pauses and a short lunch break.  A request for a dinner break was denied.  The entirety of the proceeding was recorded.

100.    Plaintiff was present with his faculty advisor and his counsel throughout. Although his legal team consisted of two attorneys, a partner and an associate, both with different knowledge, experience, and roles, the Academy only permitted one attorney to be present in the hearing room.  The other attorney was required to remain outside during the entirety of the Hearing.

101.    The Superintendent was the prosecutor, judge and jury in that he presented the case, presided over the Hearing and made the findings of fact.

102.    The Hearing began with the summary rejection of Plaintiff's 11-page objection letter without any explanation.

103.    Opening statements were given by Plaintiff, his advisor, and the Complainant. The Superintendent then called the Complainant to testify.  The Superintendent directly questioned the Complainant as to her allegations.  The Superintendent questioned the Complainant in a neutral, non-confrontational manner, even after she provided obviously false and inconsistent testimony.

104.    In direct violation of the SA/SH Procedures which provide the right to "to question all witnesses, whether called by the Academy or by Respondent", Plaintiff was not permitted to question the Complainant; instead he was required to submit his list of cross-examination questions to the Superintendent.  The Superintendent refused to ask the

21

Complainant questions that would have revealed her lack of credibility, including those concerning her relationship with the midshipman who filed the complaint on her behalf – the "Friend" who had been the Complainant's sister's Ring Dance date and had then-taken-up with Complainant.

105.    The Superintendent elicited hearsay testimony from Complainant, having her testify to conversations she had had with law enforcement during which she suggested that the law enforcement investigation had not been closed and wasn't active because she had not definitively stated she wanted to pursue charges.

106.    The Complainant's Hearing testimony was contradictory, inconsistent with statements she made previously, inconsistent with the testimony of others, changed repeatedly, and was replete with falsehoods.

107.    Plaintiff was called to testify by the Superintendent nearly 10 hours into the Hearing after Plaintiff had examined 10 witnesses.

108.    The Superintendent vigorously and aggressively cross-examined the Plaintiff, questioning his version of events and his judgment on the night in question. The Superintendent had not acted in the same manner towards the Complainant.

109.    Although Complainant's sister declined to appear at the Hearing to testify, the Superintendent demanded Plaintiff speculate as why she wanted the Complainant to sleep in the same room as her. The testimony was clear that Plaintiff never discussed the issue with Complainant's sister and was unware of her view on the matter; but still the Superintendent pressed Plaintiff to speculate.

110.    In addition, the Superintendent aggressively cross-examined Plaintiff on a mis-statement of the record, concerning admonitions supposedly made by a fellow midshipman that

the Complainant was intoxicated – despite knowing that the midshipman testified at the Hearing that he had no opinion as to the Complainant's level of intoxication, if any; did not know how much, if anything, the Complainant drank that night; and had not made any statements to Plaintiff concerning the Complainant's level of intoxication.

111.    The Superintendent also cross-examined Plaintiff about his level of intoxication focusing solely on the number of drinks Plaintiff approximated (six months after the events) he consumed and without regard to the amount of time over which he consumed it. The Superintendent also questioned Plaintiff about the Complainant's consumption of alcohol in the same manner.

112.    Though he elicited hearsay statements of law enforcement officers made to Complainant, the Superintendent refused to hear testimony from Plaintiff's counsel as to his conversations with members of law enforcement concerning Plaintiff's candor and truthfulness during his voluntary interview with the Detective and the closing of the law enforcement investigation, on the ground that it was impermissible hearsay.

113.    Although advised by Counsel for the Academy that breaks would be permitted during Plaintiff's testimony, so long as a question was not pending, the Superintendent refused multiple requests for breaks, including a request for a dinner break made more than six hours after the conclusion of a lunch break and approximately 10 hours after the start of the hearing.

114.    Plaintiff was honest and forthright in his testimony. His testimony was consistent with his prior statements and was corroborated by other witnesses and documentary evidence.

115.    The Hearing concluded at approximately 9:40 p.m., nearly 12 hours after it began.

116.    The Superintendent only called three witnesses, the Complainant, and two midshipman whom, upon information and belief, the Superintendent believed would support the

23

charges. The Complainant's sister refused to appear at the Hearing. The Superintendent failed to call any of the many midshipmen who had interacted with and observed the Complainant on the night in question.

117. The Plaintiff was forced to call seven witnesses. Six of the witnesses were midshipmen who testified concerning their interactions with or observations of the Complainant on the night in question. These witnesses provided exculpatory evidence proving the Complainant was not intoxicated to the point of being unable to consent to sexual activity, she willingly engaged in sexual activity with Plaintiff, and she lied during her testimony at the Hearing and in her statement to the Academy's public safety officer, Mr. Thomas.

118. The remaining witness was Mr. Thomas, who had conducted the investigation on behalf of the Academy.

119. The Hearing procedures were physically and emotionally overwhelming and grueling for Plaintiff. Not only did the Hearing last nearly 12 hours but Plaintiff was required to serve as his own attorney throughout, giving opening and closing statements, making legal and factual arguments and objections, and examining witnesses, all in addition to having to testify and being subjected to vicious cross-examination by the Superintendent – despite absolutely no legal training.

120. The Hearing was adjourned until Monday, February 12, 2018, for the Superintendent's decision and the start of Phase II (the punishment phase), in the event it was necessary.

121. The Hearing reconvened on Monday, February 12, 2018, at or about 10:00 a.m. The Superintendent immediately rendered his decision finding Plaintiff in violation of Superintendent Instruction 2016-02 and ¶ 243(a) of the Midshipman Regulations. He dismissed

as redundant the charge that Plaintiff had violated ¶ 243(b) of the Midshipman Regulations and further dismissed the charge that Plaintiff had violated ¶ 204(f) of the Midshipman Regulations.

122. The Superintendent issued no findings of fact and never explained the basis of his decision.

*Phase II*

123. The Superintendent then convened Phase II of the Hearing – the punishment phase – immediately after rendering his decision. The Plaintiff called five character witnesses on his behalf, the maximum he was told he was permitted to call – although neither the Midshipman Regulations nor the SA/SH Procedures contained such a restriction. He was also questioned again by the Superintendent.

124. The Complainant was permitted to make a "victim impact statement". She was not questioned by the Superintendent and Plaintiff was not permitted to ask her any questions.

125. Phase II of the Hearing was adjourned for the Superintendent to deliberate on the punishment to impose. Approximately two hours later Plaintiff, his advisor, and his counsel were notified that the Superintendent had additional questions for Plaintiff and should reconvene in the Hearing room, which they did. However, the Superintendent did not appear for another hour.

126. Upon reconvening, the Superintendent forewent asking Plaintiff any additional questions and instead pronounced punishment.

127. The Superintendent imposed a suspension for the rest of the academic year (referred to as a "setback"), which was one term consisting of nine weeks.

128.    Due to the structured nature of the midshipman curriculum, as a practical matter, the setback amounted to a one year suspension since Plaintiff's remaining courses are only offered to first classmen (seniors) in the third term.

129.    Plaintiff was told that he was not entitled to appeal of the Superintendent's Phase I decision or the Phase II punishment imposed.  Plaintiff was told that his only recourse was to seek for reconsideration to the Superintendent himself – prosecutor, judge, jury, and appellate panel.

**The Reconsideration Application**

130.    Plaintiff timely submitted his notice of intention to seek reconsideration of the Superintendent's Phase I decision and the Phase II punishment imposed.  This had the effect of staying the Superintendent's imposed setback.

131.    Plaintiff was permitted to remain on campus, complete his second term courses, and his final exams for that term.  The third term – which would have been his last prior to graduation – began March 9, 2018 and Plaintiff was permitted to begin his third term and attend all registered courses.

132.    On or about March 2, 2018, Plaintiff's counsel submitted an application for reconsideration to the Superintendent on behalf of Plaintiff.   Included with it were additional character letters; a letter from Plaintiff addressing what he learned from this process, raising concerns about the punishment imposed, and suggesting alternative punishments; a letter from Plaintiff's parents recounting the financial hardship they have endured as a result of the Hearing; a letter from Plaintiff's faculty advisor raising concerns about the impact the punishment will have on Plaintiff's ability to successfully complete his academic requirements for graduation; and a copy of counsel's February 8, 2018 objection letter.

26

133.   As to the Superintendent's finding of guilt, Plaintiff again raised objections to the lack of due process afforded by the Hearing procedures.  In addition, he objected on the grounds that the findings were against the weight of the evidence and inconsistent with the findings of law enforcement.  Plaintiff also objected to the Superintendent's failure to apply the relevant definition of consent from Superintendent Instruction 2016-02

134.   As to the punishment imposed, Plaintiff raised concerns about the impact on his ability to successfully complete his studies and obtain his degree, mariner's license, and military commission.  Plaintiff also proposed alternative punishments that would have a more positive impact on the Academy and Plaintiff's fellow midshipmen.

135.   On or about March 20, 2018, the Superintendent issued a decision denying Plaintiff's request for reconsideration.  No basis for the denial was given.  At that time, Plaintiff had completed approximately a week and a half of his final term – nearly 20%.

136.   Plaintiff was required to complete check out procedures and immediately depart the Academy on a "leave of absence".

137.   Plaintiff has returned home to Michigan.

## AS AND FOR THE FIRST CAUSE OF ACTION

### (Review Pursuant to the Administrative Procedure Act)

138.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "137" with the same force and effect as though fully set forth herein.

139.   Defendants are all agents as defined by 5 U.S.C. §701, and thus, their actions are subject to review under the Administrative Procedure Act.

140.   Defendants' actions are final.

141.   There is no adequate remedy at law.

142.    Defendants' aforesaid conduct, which resulted in Plaintiff being found to have committed sexual assault and being setback to the class of 2019, violated the Academy's own rules and procedures regarding such Hearings; was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; was contrary to the Due Process Clause of the Fifth Amendment; and/or was in excess of statutory jurisdiction, authority, or limitations.

143.    Pursuant to 5 U.S.C. §706, this Court should hold Defendants' actions to be unlawful and should (i) set aside Defendants' finding that Plaintiff violated Superintendent Instruction 2016-02 and ¶ 243(a) of the Midshipman's Regulations; and (ii) reinstate Plaintiff to the Academy with all rights and privileges afforded all midshipmen.

144.    In the alternative, pursuant to 5 U.S.C. §706, this Court should hold Defendants' actions to be unlawful and should compel Defendants to provide Plaintiff with a new Hearing in accordance with the Academy's rules and procedures.

## AS AND FOR THE SECOND CAUSE OF ACTION

## VIOLATION OF THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION
### (Substantive Due Process)

145.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "144" with the same force and effect as though fully set forth herein.

146.    Plaintiff has property and liberty rights in his education and in the degree, license and official commission he is seeking, and all other rights and benefits granted to midshipmen enrolled at the Academy.

147.    Defendants' actions with respect to Plaintiff's property and liberty rights amounted to a deprivation of such rights in that Defendants have improperly found him guilty of sexual assault, improperly set him back to the Class of 2019, and are improperly precluding

28

Plaintiff from completing his course of study at the Academy in a timely manner and graduating with his class of admission.

148.     Defendants' aforementioned conduct was in violation of the Academy's own policies, rules and regulations, was arbitrary and capricious and did not involve the exercise of proper judgment.

149.     Defendants' aforementioned conduct was motivated by bad faith or ill will unrelated to Plaintiff's guilt or innocence with respect to the charged conduct.

150.     Defendants deliberately and prejudicially assumed Plaintiff's guilt, failed to follow their own procedures, rushed to judgment, ignored the Academy's own policies, were intentionally dismissive of Plaintiff's statements and rights, and then overzealously punished Plaintiff to serve political purposes to deflect attention from the Academy concerning the Academy's handling of prior claimed violations of Superintendent Instruction 2016-02 and its predecessor.

151.     Defendants' aforementioned conduct violated Plaintiff's rights and was in violation of the Fifth Amendment of the United States Constitution.

152.     Defendants' violations of the Fifth Amendment have injured and will continue to injure Plaintiff.  Defendants' actions have thrown a young man's life, and future, in turmoil.  A thorough and unbiased review of the facts and circumstances was required.

153.     Plaintiff is entitled to equitable and injunctive relief, and compensatory and punitive damages sustained as a result of Defendants' violations.

## AS AND FOR THE THIRD CAUSE OF ACTION

## VIOLATION OF THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION
### (Procedural Due Process)

154.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "153" with the same force and effect as though fully set forth herein.

155.    Plaintiff has property and liberty rights in his education and in the degree, license and official commission he is seeking, and all other rights and benefits granted to midshipmen enrolled at the Academy and as a result of successful graduation from the Academy.

156.    Defendants' actions with respect to Plaintiff's property and liberty rights amounted to a deprivation of such rights in that Defendants improperly found him in violation of Superintendent Instruction 2016-02 and the Midshipman Regulations, improperly set back Plaintiff to the Class of 2019, and are improperly precluding Plaintiff from completing his course of study at the Academy in a timely manner and graduating with his class of admission.

157.    The aforementioned deprivation occurred without sufficient Due Process as afforded by the Fifth Amendment of the United States Constitution, as Defendants failed to afford Plaintiff a fair and meaningful opportunity to oppose the charges against him and seek review of his suspension.

158.    Defendants failed to follow procedures to safeguard the rights of the Plaintiff and treated Plaintiff in a manner that was inconsistent with the manner in which they are obligated to handle midshipmen.

159.    Defendants failed to comply with their own policies, procedures, rules and regulations relating to the conduct of investigations and Plaintiff's Hearing including but not

limited to the procedures and provisions set forth in the Midshipman Regulations and/or those delineated in the SA/SH Procedures.

160.    The decisions to find Plaintiff guilty, impose a setback to the Class of 2019 and deny his application for reconsideration were not careful and deliberate decisions nor were they arrived at in conformance with due process considerations or supported by the evidence.

161.    As a result of Defendants' aforementioned conduct, Plaintiff is entitled to declaratory and injunctive relief.

WHEREFORE, Plaintiff requests that this Court grant the following relief:

A.    Declare the action of Defendants, their agents, employees, others and successors in interest illegal and in violation of the United States Constitution and federal and state laws;

B.    Pursuant to 5 U.S.C. §706, deem Defendants' actions to be unlawful, set aside Defendants' determination that Plaintiff violated the Midshipman Rules and Regulations and Superintendent Instruction 2016-02;

C.    Pursuant to 5 U.S.C. §706, deem Defendants' actions to be unlawful, and compel the Academy to immediately reinstatement Plaintiff as a Midshipman at the Academy as a member of the Class of 2018, allow him to complete his studies at the Academy and if successfully completed, to graduate, and afford him all rights and benefits that he would have been afforded but for Defendants' improper conduct;

D.    Award Plaintiff compensatory, actual, and punitive damages, in an amount to be determined at trial;

E.    Award Plaintiff all costs, expenses and reasonable attorneys' fees; and

31

F.    Grant such other and further relief as to the Court is just and proper.

Dated: March 28, 2018

Respectfully submitted,

GERALD B. LEFCOURT, P.C.

By:

Gerald B. Lefcourt
Faith A. Friedman
Sheryl E. Reich
*Attorneys for Plaintiff*
1841 Broadway, Suite 910
New York, New York 10023
(212) 737-0400
lefcourt@lefcourtlaw.com

STATE OF NEW YORK, COUNTY OF _____ ss.:

I, the undersigned, am an attorney admitted to practice in the courts of New York, and

☐ **Attorney's Certification** certify that the annexed _____ has been compared by me with the original and found to be a true and complete copy thereof.

☐ **Attorney's Verification by Affirmation** say that: I am the attorney of record, or of counsel with the attorney(s) of record, for _____. I have read the annexed _____ know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon the following.

The reason I make this affirmation instead of _____ is

I affirm that the foregoing statements are true under penalties of perjury.

Dated: _____

.......................................................................
*(Print signer's name below signature)*

STATE OF NEW YORK, COUNTY OF _____ ss.:

_____ being sworn says: I am

☐ **Individual Verification** in the action herein; I have read the annexed _____ know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true.

☐ **Corporate Verification** the _____ of _____ a corporation, one of the parties to the action; I have read the annexed _____ know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon the following:

Sworn to before me on _____ , 20 ____

.......................................................................
*(Print signer's name below signature)*

.......................................................................

STATE OF NEW YORK, COUNTY OF _____ ss.:

_____ being sworn says: I am not a party to the action, am over 18 years of age and reside at _____

On _____ , 20 ____ , I served a true copy of the annexed _____ in the following manner:

☐ **Service by Mail** by mailing the same in a sealed envelope, with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service, addressed to the address of the addressee(s) indicated below, which has been designated for service by the addressee(s) or, if no such address has been designated, is the last-known address of the addressee(s):

☐ **Personal Service** by delivering the same personally to the persons at the address indicated below:

☐ **Service by Facsimile** by transmitting the same to the attorney by facsimile transmission to the facsimile telephone number designated by the attorney for that purpose. In doing so, I received a signal from the equipment of the attorney served indicating that the transmission was received, and mailed a copy of same to that attorney, in a sealed envelope, with postage prepaid thereon, in a post office or official depository of the U.S. Postal Service, addressed to the address of the addressee(s) as indicated below, which has been designated for service by the addressee(s) or, if no such address has been designated, is the last-known address of the addressee(s):

☐ **Service by Electronic Means** by transmitting the same to the attorney by electronic means upon the party's written consent. In doing so, I indicated in the subject matter heading that the matter being transmitted electronically is related to a court proceeding:

☐ **Overnight Delivery Service** by depositing the same with an overnight delivery service in a wrapper properly addressed, the address having been designated by the addressee(s) for that purpose or, if none is designated, to the last-known address of addressee(s). Said delivery was made prior to the latest time designated by the overnight delivery service for overnight delivery. The address and delivery service are indicated below:

Sworn to before me on _____ , 20 ____

.......................................................................

.......................................................................
*(Print signer's name below signature)*