# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

───────────────────

№ 18-CV-1870 (JFB) (AKT)

───────────────────

## JOHN DOE,

Plaintiff,

VERSUS

## UNITED STATES MERCHANT MARINE ACADEMY, ET AL.,

Defendants.

───────────────────

**MEMORANDUM AND ORDER**
April 20, 2018

───────────────────

JOSEPH F. BIANCO, District Judge:

Plaintiff John Doe ("plaintiff") brings the instant action against defendants United States Merchant Marine Academy (the "Academy"), James A. Helis, individually and in his capacity as Superintendent of the Academy, the United States Department of Transportation, and the United States of America (collectively, "defendants" or the "government"). Plaintiff claims that defendants improperly and unlawfully suspended him as a result of an unfavorable determination at a hearing at the Academy (the "Hearing"), thereby barring him from completing his final term and graduating with his class. Plaintiff claims that his Hearing and suspension violated the Academy's own rules under the Administrative Procedure Act (the "APA"), and violated the Due Process Clause of the Fifth Amendment. Plaintiff argues that he is, therefore, entitled to equitable and injunctive relief,[1] as well as compensatory and punitive damages.

Plaintiff now seeks a preliminary injunction that would compel the Academy to immediately reinstate plaintiff, permitting him to complete his third-term courses, sit for his licensing examination, and attend the Class of 2018 graduation ceremony.

For the reasons set forth below, the Court concludes that plaintiff has failed to demonstrate a likelihood of success on his APA claim, or on his claim that defendants

───────────────────

[1] Plaintiff requests that the Court set aside defendants' adverse finding against him and order that the Academy reinstate him with full rights and privileges or, in the alternative, compel defendants to provide him with a new hearing, in accordance with the Academy's rules.

violated his procedural and substantive due process rights.

With respect to the APA claim, the Court concludes that the Academy's disciplinary proceeding was conducted in a manner that is consistent with the rules and procedures promulgated by the Superintendent pursuant to the authority delegated to him by statute. Although plaintiff argues that various procedures were inconsistent with the Academy's existing rules and policies (including, among other things, proceeding by a Superintendent's Hearing instead of an Executive Board Hearing, and requiring plaintiff to cross-examine the alleged victim through written questions asked by the Superintendent), the Court disagrees. In addition, the Court finds unpersuasive plaintiff's argument that the Superintendent applied the wrong standard in determining whether the alleged victim consented because there is no indication in the record of any such misunderstanding. Moreover, there is substantial evidence in the record, if credited by the Superintendent (including the testimony of the alleged victim of the sexual assault, as well as plaintiff's friend who was present at various times on the night of the alleged assault), to support the Superintendent's decision. In particular, based upon the alleged victim's testimony, there is more than sufficient evidence in the record for the Superintendent to have concluded that she was unable to lawfully consent to sexual activity because of her intoxication. Although plaintiff's testimony contradicted the alleged victim's testimony, and plaintiff also called other witnesses at the Superintendent's Hearing who supported his version of events (and plaintiff emphasized that the Manhattan District Attorney's Office did not initiate charges after conducting an investigation), the Superintendent was entitled to weigh that evidence and make the necessary credibility findings in connection with the charges. Having carefully reviewed

the record, the Court does not believe that plaintiff can possibly show that the decision was arbitrary or capricious (or contrary to law) based upon the manner in which the disciplinary proceeding was conducted or the evidence adduced at that proceeding.

The Court also concludes that plaintiff is not likely to succeed on his procedural due process claims. Plaintiff was provided with the following: (1) notice of the charges against him; (2) the right to review the investigatory file; (3) a Superintendent's Hearing during which, although plaintiff had to conduct the Hearing himself, he had the assistance of counsel and a faculty advisor; (4) at the Hearing (which lasted approximately twelve hours and involved eleven witnesses in connection with whether the charges were proven in Phase I), plaintiff was given the opportunity to cross-examine witnesses directly (with the exception of the alleged victim of the sexual assault, for whom he submitted written questions, and follow-up questions, to be asked by the Superintendent), and to testify and to call his own witnesses; and (5) an opportunity to give an opening and closing statement at the Hearing. Based upon well-settled Second Circuit precedent regarding due process requirements in the context of a disciplinary proceeding of this nature, and the Court's careful review of the record before it (including a review of the proceeding itself), the Court concludes that the due process protections afforded to plaintiff at the Hearing were more than sufficient to satisfy the constitutional standard under the Fifth Amendment in this type of disciplinary proceeding. Although plaintiff argues that due process required additional protections, the Court disagrees and emphasizes that due process does not mandate the use of all of the protections of a criminal trial in this type of disciplinary proceeding. To the extent that plaintiff challenges the implementation of the procedures at the Hearing (including the

manner in which the Hearing was conducted, such as the number and length of breaks), the Court is not persuaded that any of those purported issues, either individually or collectively, rises to a constitutional magnitude or impacts the fundamental fairness of the proceeding. For example, the Court concludes that plaintiff's allegations of unconstitutional bias by the Superintendent in his dual role as prosecutor and neutral decision-maker are not supported by the case law or the record. Accordingly, plaintiff has not demonstrated a likelihood of success on the merits in connection with his procedural due process claims. For the same reasons, the Court concludes that plaintiff is unlikely to prevail under the exacting standard for demonstrating a substantive due process violation.

In light of the Court's determination that plaintiff has failed to demonstrate a likelihood of success on the merits with respect to any of his claims, he is not entitled to a preliminary injunction. Accordingly, the Court denies the motion.[2]

## I. BACKGROUND

The following facts are taken from the complaint, as well as the parties' submissions to the Court.

### A. The Statutory and Regulatory Framework

As discussed *supra*, the allegations in this case arise from a Hearing held by the U.S. Merchant Marine Academy. The Academy is a federal institution operated by the Maritime Administration ("MARAD"), which is an operating administration of the Department of Transportation. (Def. Mem. at 3.) Under 46 U.S.C. § 51301, the Secretary of Transportation is authorized to maintain the Academy as an institution of higher education to prepare its students for service in the U.S. Merchant Marine, among other objectives. 46 U.S.C. § 51301(a).

The Secretary of Transportation delegated authority to carry out its functions under this provision to the MARAD Administrator, 49 C.F.R. § 1.93, who, in turn, delegated direction and supervision of the Academy to the Academy's Superintendent. (Def. Mem. at 3 (citing Maritime Administrative Order, 150-1).) The Academy's operation and maintenance is governed by 46 U.S.C. § 51301 *et seq.* and regulations promulgated thereunder. Section 51318 establishes that the Superintendent is required to "prescribe a policy on sexual harassment, dating violence, domestic violence, sexual assault, and stalking applicable to the cadets and other personnel of the Academy." 46 U.S.C. § 51318(a). This provision sets forth the "[m]atters to be specified in the policy," including "a procedure for disciplinary action in cases of alleged criminal sexual assault involving a cadet or other Academy personnel," and "any other sanction to be imposed in a substantiated case of sexual harassment, dating violence . . . or any other criminal sexual offense." *Id.* The Superintendent has also been delegated the authority to issue "all regulations necessary for the accomplishment of the Academy's mission." 46 C.F.R. § 310.67.

Pursuant to this statutory grant of authority, the Superintendent has promulgated policies and procedures

---

[2] Plaintiff also states that this action arises under *Bivens v. Six Unknown Fed. Bureau of Narcotics Agents*, 403 U.S. 388 (1971). (Compl. ¶ 9.) Other than this jurisdictional statement, the complaint lacks any allegations supporting a claim pursuant to *Bivens*. Even assuming *arguendo* that plaintiff has stated a *Bivens* claim, the Court concludes there is no likelihood of success on the merits on that claim for the same reasons discussed with respect to the other claims in this action.

governing sexual misconduct, including policies aimed at prevention, raising awareness, and conducting disciplinary actions. These regulations include Superintendent Instruction 2016-02 ("SI 2016-02"), which is the Academy's "Sexual Assault, Dating Violence, Domestic Violence, Stalking, Prevention Education, and Response Policy" (ECF No. 14-1 ("SI 2016-02")), and Midshipman Regulations paragraphs 243(a) and (b) (ECF No. 3 at 48).[3] Paragraph 243 prohibits sexual misconduct, which paragraph 243(a) defines as "acts at the Academy . . . or under circumstances that are discrediting to the Academy or the midshipman, or are prejudicial to good order and discipline in the Regiment of Midshipmen." (*Id.*) Paragraph 243(b) states that sexual misconduct includes "any actions of a sexual nature that would reasonably excite or satisfy the sexual desires of the actor . . . includ[ing] kissing, touching, sexual

intercourse of any sort, . . . and indecent exposure." (*Id.*)

SI 2016-02 provides that the Academy "may pursue an administrative investigation and disciplinary proceedings" against an accused midshipman pursuant to the Midshipman Regulations or the Academy's "Procedures for Superintendent's Disciplinary Hearing in the Case of Sexual Assault/Harassment" (the "SA/SH Procedures"). (SI 2016-02 at 5.) Under these policies, the Academy can conduct either a Superintendent's Disciplinary Hearing or an Executive Board Hearing, as discussed *infra*. In Superintendent's Hearings (the type of hearing at issue in this case), midshipmen have a right to appeal the Superintendent's decision to the Maritime Administrator *if* the penalty imposed is disenrollment. (ECF No. 14-2 ("SA/SH Procedures") at 2, 5.) Otherwise, midshipmen can request the Superintendent's reconsideration of his decision,[4] but the SA/SH Procedures do not

---

[3] SI 2016-02 defines "sexual assault" as "a crime of violence defined as intentional touching of a sexual nature against the will (by use of force, physical threat, or abuse of authority) or without the consent of the victim." (SI 2016-02 at 2.)

SI 2016-02 provides a non-exhaustive list of conduct that constitutes sexual assault:

> i) Unwanted kissing, groping, fondling, or other more aggressive physical acts, such as rape, nonconsensual sodomy (oral or anal sex), or attempts to commit these acts; ii) Sexual contact with someone whom you reasonably should have known was impaired and, thus unable to consent, due to the use of alcohol or drugs (including prescription medications); iii) Sexual contact with someone who is "passed out," sleeping, or otherwise incapacitated; iv) Sexual contact with someone who is unable to say "no" and/or change their mind due to the presence of coercion or intimidation; and v) Sexual contact with someone who is under the age of consent in the jurisdiction in which the sexual assault occurs.

(*Id.* at 2-3.)

SI 2016-02 defines "consent" as:

> Consent is an affirmative decision to engage in mutually agreed upon sexual activity and is given by clear words or actions. Consent may not be inferred from silence, passivity or lack of resistance alone. Consent to one form of sexual activity does not imply consent to other forms of sexual activity, and the existence of a current or previous dating or sexual relationship is not sufficient to constitute consent to additional sexual activity. Assent shall not constitute consent if it is given by a person who is unable to lawfully give his or her consent because of youth, disability, intoxication or other condition, or coercion or intimidation.

(*Id.* at 3.)

[4] The right to apply for the Superintendent's reconsideration of his decision is not discussed in the SA/SH Procedures, but this right is established in the Midshipman Regulations (ECF No. 14-3 ("Midshipman Regulations") at 12), and is provided in Superintendent's Hearings as well as Executive Board

provide a right to appeal to the Maritime Administrator where any other penalty was imposed (*id.*). Under the APA, a midshipman can seek judicial review of an Academy Hearing decision once it is "final"[5] and there is "no other adequate remedy in a court." 5 U.S.C. § 704.

## B. The Complaint

The following allegations are taken from the complaint filed by plaintiff in the instant action.[6]

### 1. The Alleged Misconduct

The Academy held the Hearing at issue in this case to decide whether plaintiff had violated the Academy's sexual assault policy, in response to allegations following the Academy's annual Ring Dance the previous summer. (Compl. ¶ 19.) Every August, the midshipmen in the rising senior class receive their class rings during a formal ceremony, and the Academy holds the Ring Dance to celebrate this milestone event. (*Id.*)

Plaintiff, a member of the Academy's Class of 2018, attended the Ring Dance for his class on August 12, 2017. (*Id.* ¶¶ 22-23.) Midshipmen typically attend this dance with dates and, as plaintiff did not have one, a friend (the "Friend") suggested that he could set plaintiff up with his date's sister. (*Id.* ¶¶ 20, 23.) The Friend told plaintiff that the sister (the "Complainant") was "hotter" than his own date, and conveyed his interest in a sexual relationship with her. (*Id.* ¶ 24.)

Plaintiff accepted the Friend's offer to arrange the date. (*Id.* ¶ 23.)

The Academy is located on Long Island and, as the dance was held in Manhattan, plaintiff arranged to stay in a hotel near the venue—as many midshipmen do—the night of the dance. (*Id.* ¶¶ 21, 25.) The Friend had also arranged to stay in Manhattan that night, as well as the night before, and was sharing a room with Complainant and her sister (his date). (*Id.* ¶ 25.) The night before the dance, plaintiff met the Friend and their dates for drinks at a bar in midtown, where he met Complainant for the first time. (*Id.*) Plaintiff and Complainant spent time together that night and had alcoholic drinks. (*Id.* ¶ 25.)

According to the complaint, the next night—the night of the dance, plaintiff and the Friend checked into separate rooms at a different hotel from the one where the Friend had stayed the night before, with Complainant and her sister again staying in the Friend's room. (*Id.* ¶ 27.) Prior to the dance, plaintiff and the Friend purchased and drank wine together, but Complainant did not have any. (*Id.* ¶ 29.) At the venue, plaintiff and Complainant presented photo identification demonstrating that they were over twenty-one to get a wristband for free drinks. (*Id.* ¶ 32.) Complainant, who was eighteen years old, allegedly presented false identification that the Friend helped her obtain. (*Id.* ¶ 33.)

Plaintiff and Complainant spent several hours at the dance together. As is tradition,

---

Hearings (*see, e.g.*, Compl. ¶ 132). The Midshipman Regulations state the right to request reconsideration generally; there is no language limiting its availability to certain types of hearings.

[5] In Executive Board Hearings, the Executive Board sends its recommendation to the Superintendent, who reviews the recommended penalty and issues a final decision. (Midshipman Regulations at 3, 9.) As in Superintendent's Hearings, in Executive Board Hearings, midshipmen have a right to appeal the

Superintendent's decision to the Maritime Administrator only where the penalty imposed was disenrollment. (*Id.* at 12.) Alternatively, they can request reconsideration by the Superintendent. (*Id.*)

[6] As discussed *infra*, Complainant disputes substantial portions of plaintiff's version of the facts in question, and asserted at the Hearing that she was too intoxicated to given her consent to sexual intercourse with plaintiff on the evening of August 12-13, 2017.

plaintiff kissed Complainant on the cheek at the end of the Ring Dipping Ceremony during the dance. (*Id.* ¶¶ 20, 34.) Later in the night, plaintiff and Complainant were seen dancing "provocatively" and kissing, and no one tried to stop them. (*Id.* ¶ 35.) Complainant allegedly initiated the kissing. (*Id.*)

After the dance, plaintiff and Complainant spent time together on the Friend's hotel room balcony with a group of midshipmen and their dates. (*Id.* ¶¶ 36-38.) According to the complaint, plaintiff and Complainant were not drinking. (*Id.* ¶ 38.) At the end of the night, Complainant told her sister and the Friend that she intended to sleep in plaintiff's room. (*Id.*) Plaintiff was not part of this conversation. (*Id.*) The sister and the Friend expressed their disapproval, but neither they nor anyone else did anything more to stop her. (*Id.* ¶ 39.) The Friend told plaintiff not to engage in sexual intercourse with Complainant because she was too intoxicated. (*Id.* ¶ 40.) According to the complaint, plaintiff had not planned to and agreed that he would not have sexual intercourse with Complainant. (*Id.*) Complainant took her suitcase, and she and plaintiff left for her room. (*Id.* ¶ 41.)

It is further alleged that, as soon as plaintiff and Complainant entered plaintiff's hotel room, Complainant began kissing plaintiff, and then initiated sexual contact. (*Id.* ¶ 42.) She allegedly "made it clear through her words and actions she wanted to engage in sexual intercourse with Plaintiff, was consenting . . . , and had the mental capacity to consent, including without limitation by telling Plaintiff to put on a condom." (*Id.* ¶ 43.) Plaintiff asserts that he had not anticipated having sexual intercourse with Complainant, so he did not have a condom with him. (*Id.* ¶ 44.) According to the complaint, "at the Complainant's behest" plaintiff purchased a condom from a kit in the hotel room. (*Id.*) Plaintiff and Complainant had sexual intercourse then and a second time that night, after Complainant allegedly initiated by positioning herself on top of plaintiff. (*Id.* ¶ 45.) Plaintiff asserts that the second time they had intercourse, "[a]gain, through her words and actions Complainant made it clear to [him] that she wanted to engage in sexual intercourse with him, was consenting . . . and had the mental capacity to consent." (*Id.*) Complainant then changed into clothing to sleep and slept in the bed with plaintiff. (*Id.* ¶ 46.)

According to the complaint, in the morning, Complainant and plaintiff stayed in bed talking and cuddling. (*Id.* ¶ 47.) Complainant added herself as a "friend" to plaintiff's Snapchat account. (*Id.*) The Friend texted plaintiff to say he needed assistance tidying the balcony in his room. (*Id.* ¶ 48.) Complainant jokingly said to plaintiff that she would be sick if they had to go clean, which plaintiff texted to the Friend, but the two decided to return to the Friend's room. (*Id.*) However, Complainant had also texted her sister to inform her of what had happened the night before and, within a few minutes, the Friend texted plaintiff to say he knew he had had sexual intercourse with Complainant. (*Id.* ¶¶ 49-50.) According to the complaint, Complainant had not given plaintiff any reason to think she was upset. In addition to adding herself to his Snapchat account, before leaving, Complainant allegedly told plaintiff she had had a good time and hugged him goodbye. (*Id.* ¶ 49.)

Later that night, the Friend accused plaintiff of sexually assaulting Complainant, claiming that she had been too intoxicated to consent. (*Id.* ¶ 50.) Over the course of the next several weeks, the Friend and Complainant started dating. (*Id.* ¶ 51.)

In October 2017, Complainant's mother contacted law enforcement. (*Id.* ¶ 52.) According to the complaint, Complainant

was "adamant" that she did not want to file charges, but her mother and others pressured her to do so. (*Id.*) Complainant called plaintiff twice several months after the Ring Dance to ask what had happened that night, claiming not to remember. (*Id.* ¶ 51.) Law enforcement arranged and recorded those phone calls. (*Id.*)

### 2. The Investigation

According to the complaint, the Academy was notified of the alleged sexual assault in October 2017. (*Id.* ¶ 53.) Allegedly, the Friend, Complainant's new boyfriend, pressured her to file a complaint with the Academy, and first reported the allegations. (*Id.* ¶¶ 52, 54.) According to the Superintendent, Complainant's mother first reported the alleged sexual assault to the Academy. (Decl. of James A. Helis ("Helis Decl.") ¶ 9.) The initial report was then referred to the Director of the Academy's Department of Public Safety, Jeffrey Thomas.[7] (Compl. ¶ 55.) Thomas then contacted Complainant's mother, who described the allegations and informed him that the matter had been reported to law enforcement. (*Id.* ¶ 56.)

On November 1, 2017, Thomas met with the detective in the New York City Police Department ("NYPD") assigned to investigate the complaint (the "Detective") and a Special Agent from the Department of Transportation Inspector General's Office. (*Id.* ¶ 57.) That day, Thomas also contacted Complainant's mother to arrange an interview with Complainant. (*Id.* ¶ 58.) Rather than agree to the interview, on November 3, 2017, Complainant's mother

responded with an emailed, unsigned, unsworn statement that was allegedly from her daughter. (*Id.*) On November 9, 2017, Thomas conducted a phone interview with Complainant. (*Id.* ¶ 59.) He asked follow-up questions, but did not go through each of her allegations. (*Id.*) This phone interview was the only time Thomas spoke with Complainant. (*Id.*)

Also on November 9, 2017, the Detective informed Thomas that Complainant and her mother contacted him about bringing criminal charges. (*Id.* ¶ 60.) The Detective requested that Thomas not interview plaintiff until the Detective had spoken with him. (*Id.*) On November 13, 2017, the Detective interviewed plaintiff at the Academy. (*Id.* ¶ 61.) Thomas was present throughout the interview. (*Id.*) Plaintiff was not informed that the Academy was also conducting an investigation. (*Id.*) The Detective read plaintiff his *Miranda* rights, and plaintiff waived his right to remain silent and voluntarily submitted to the Detective's questioning. (*Id.* ¶ 62.) Plaintiff did not have counsel, an advisor, or his parents present. (*Id.*) Plaintiff asserts that he answered all questions and was honest and forthright. (*Id.*) According to the complaint, he "never wavered" regarding what happened the night of the Ring Dance, insisting that Complainant was "a willing, active and consenting participant in all sexual activity, and at times was the aggressor," and noting that she had asked him to get a condom and positioned herself on top of him to initiate sex. (*Id.* ¶ 63.) Plaintiff was also firm about the fact that Complainant was not too intoxicated,

---

[7] The parties' accounts differ as to who first reported the alleged assault to the Academy. According to the complaint, the Friend first contacted the regimental Sexual Assault Victim Advocate Petty Officer. (Compl. ¶¶ 53-54.) This officer, a midshipman, referred the Friend to the Academy's Sexual Assault Prevention and Response Program Manager, an

Academy employee, who then contacted Thomas. (*Id.* ¶¶ 54-55.) According to the Superintendent, on October 20, 2017, Complainant's mother first contacted the Academy's Sexual Assault Response Coordinator, who referred the complaint to Thomas. (Helis Decl. ¶ 9.)

had the mental capacity to, and did, in fact, consent to all sexual activity. (*Id.* ¶ 64.)

### 3. The Notice of Disciplinary Charges

On January 10, 2018, the Academy provided plaintiff with a "Notice of Superintendent's Disciplinary Hearing" (the "Notice") that directed plaintiff to appear for a hearing on January 19, 2018, and outlined the charges against him. (*Id.* ¶¶ 65-70; ECF No. 3-1[8] at 3.) The Notice stated that plaintiff was charged with violating Superintendent Instruction 2016-02 and Midshipman Regulations paragraphs 243(a) and (b) by sexually assaulting his date at the Ring Dance at a hotel in New York City after the dance. (*Id.*) The Notice also stated that plaintiff was charged with violating Midshipman Regulations paragraph 204(f) by failing to prevent Complainant, who was underage, from drinking unlawfully or irresponsibly. (*Id.*)

In addition to listing the charges against plaintiff, the Notice included a list of eleven witnesses that the Academy "may" call at the Hearing, a list of plaintiff's rights prior to and at the Hearing, the SA/SH Procedures, the Academy's "Investigation Report," and plaintiff's file, including his academic files, midshipman profile, company file, personnel jacket, and Sea Year file. (Compl. ¶¶ 71-72; ECF No. 3-1 at 4-5.)

The list of plaintiff's rights prior to and at the Hearing includes, among others,[9] the right "[t]o question all witnesses, whether called by the Academy or by you, except for the Complainant . . . . You may, however, submit written questions for [the Complainant] to the Superintendent, who shall review the questions and ask those questions relevant to the proceedings." (*Id.*)

The SA/SH Procedures are not included or referenced in the Midshipman Regulations and are not available online (unlike the Midshipman Regulations and SI 2016-02). (Compl. ¶ 74.) These procedures include a list of the "Rights of Respondent," including his rights:

---

[8] The document filed as ECF No. 3-1 contains a compilation of exhibits attached to the complaint.

[9] Some of plaintiff's other rights listed in the Notice include his rights:

- To receive, with the written notice, copies of all documentation to be considered by the Superintendent in making his decision, subject to you signing a Confidentiality/Non-Disclosure Agreement. (With your consent, your advisor and/or counsel may receive a copy of the relevant documentation, likewise subject to execution of a confidentiality/Non-Disclosure Agreement.)

- To seek advice and assistance of legal counsel in the preparation of your case at your own expense. Your counsel may be present at the hearing to consult and advise you, but may not otherwise participate in the proceedings.

- To request any Academy faculty or staff member other than a Chaplain, Counsel to the

Academy, member of the Commandant's Office, or witness to be called at the hearing to act as your advisor as long as serving in that capacity does not present a conflict with the faculty or staff member's professional responsibilities. In the event that you are unable to obtain an advisor, the Superintendent will appoint one on request.

- To present evidence including but not limited to documentary evidence and the testimony of reasonably available witnesses during each phase of the hearing. You must notify . . . the Superintendent's Office . . . of the identify of your witnesses. The Academy shall make reasonable efforts to insure the attendance of the witnesses identified by you who are enrolled at or employed by the Academy. Appearance by witnesses not employed by, or enrolled at, the Academy are your sole responsibility.

(Compl. ¶ 71; ECF No. 3-1 at 4-5.)

- To present evidence including but not limited to documentary evidence and the testimony of reasonably available witnesses during each phase of the hearing (determination whether violation occurred and penalty phase, if necessary). . . .

- To question all witnesses, whether called by the Academy or by Respondent.

(*Id.* ¶ 75; ECF No. 3-1 at 7.)  As plaintiff states in his complaint, the SA/SH Procedures did not authorize the Academy to prohibit him from questioning Complainant, or to prohibit him from calling witnesses whose identities were provided in a timely manner.  (Compl. ¶ 76.)  Neither the SA/SH Procedures nor SI 2016-02 specifies the standard of proof the Superintendent will apply when deciding the case, and the Superintendent never stated what standard he would apply.  (*Id.* ¶ 77.)

Plaintiff was "expressly prohibited" from providing a copy of the Notice and accompanying documents to his counsel.  (*Id.* ¶ 73.)  Plaintiff's counsel formally requested a copy of the Notice on January 10, 2018 and, having received no response, again on January 11, 2018.  (*Id.* ¶ 78.)

On January 11, 2018, plaintiff's counsel notified the Academy that law enforcement had cleared plaintiff of any wrongdoing, and that its investigation had been closed without any charges filed against plaintiff.  (*Id.* ¶ 79; *see also* Helis Decl. ¶ 14 (discussing the Manhattan District Attorney's Office and NYPD criminal investigation).)  Plaintiff's counsel argued that the Hearing should not proceed because "law enforcement had concluded that the Complainant was *lawfully* able to and had consented to engage in sexual activity with Plaintiff."  (*Id.*)  Additionally, plaintiff's counsel requested a 60-day adjournment to review the materials the Academy had provided to plaintiff and prepare for the Hearing.  (*Id.* ¶ 80.)  The Academy required plaintiff's counsel to sign a confidentiality agreement, and then, on January 12, 2018, provided counsel with plaintiff's materials in redacted form.  (*Id.* ¶¶ 81, 84.)

The Academy stated that the law enforcement decision had "no impact" on and did not "inform" its disciplinary proceedings because plaintiff was charged with violations of the Academy's "policies, not . . . a criminal act."  (*Id.* ¶ 82.)  The Academy also denied the request for a 60-day adjournment, so plaintiff's counsel requested a 30-day adjournment.  (*Id.* ¶ 83.)  On January 16, 2018, plaintiff was granted a one-week adjournment from January 19 to January 26, 2018.  (*Id.* ¶ 85.)  The Academy stated that this was "sufficient time" to prepare.  (*Id.*)  On January 17, 2018, the Academy issued a revised Notice advising plaintiff's counsel of the new Hearing date.  (*Id.* ¶ 86.)

On January 23, 2018, plaintiff secured a faculty advisor to assist him at the Hearing.  (*Id.* ¶ 87.)  The advisor had never served in this role before, and the Academy provided him with no training or guidance.  (*Id.* ¶ 88.)  On January 24, 2018, the Academy notified plaintiff's counsel that the two Notices incorrectly stated the date of the alleged misconduct as occurring in October, rather than August, and that the Hearing was therefore adjourned to February 9, 2018.  (*Id.* ¶ 89.)  The Academy issued a revised Notice advising plaintiff's counsel of the new Hearing date on January 25, 2018.  (*Id.* ¶ 86.)

On January 26, 2018, plaintiff's advisor emailed counsel for the Academy regarding due process concerns, including:

(a) [that the Notice] prohibit[ed] Plaintiff from cross-examining the Complainant in direct contravention of the SA/SH Procedures;

(b) unexplained redactions in the Investigation File; (c) [that the Academy was] affording the Complainant the right to be present throughout the proceedings and to have an advisor contrary to all other witnesses who were not provided with such rights and those rights were not provided for in the SA/SH Procedures; (d) [that the Academy was] affording the Complainant an opportunity to make a victim impact statement which is not provided for by the SA/SH Procedures; and (e) inconsistencies between the rights and protocols set forth in the Hearing Notice and those in the SA/SH Procedures.

(*Id.* ¶ 91; ECF No. 3-1 at 21-22.) The Academy's counsel addressed a number of plaintiff's advisor's concerns in an email dated January 29, 2018. (ECF No. 3-1 at 25-26.) With respect to plaintiff's right to question Complainant directly, the Academy's counsel explained that "the right to question witnesses does not confer the right to do so directly," and referred the advisor to the statement in the Notice that plaintiff "may submit written questions for the Complainant to the Superintendent, who shall review . . . and ask those questions relevant to the proceeding." (*Id.* at 26.)

On January 29, 2018, plaintiff's advisor formally lodged objections to "the Superintendent's decision to utilize procedures cobbled together from differing policies and protocols, at his discretion." (Compl. ¶ 92.) The objections included that the Academy was holding a Superintendent's Hearing rather than an Executive Board Hearing, which was available under the Midshipman Regulations. (*Id.*) He also demanded that the Academy fully comply with its policies and procedures, in particular those requiring:

- The Complainant to be treated like all other witnesses and permitted only to attend the hearing while being questioned, and appear without an advisor;

- Plaintiff to be free to question the Complainant directly, like any other witness; [and]

- The Complainant not to be allowed to deliver a victim impact statement in the event the Hearing entails a Phase II (penalty phase).

(*Id.* ¶ 93.) On January 30, 2018, the Academy denied these requests. (*Id.* ¶ 94.)

On January 31, 2018, the Academy notified plaintiff's advisor and counsel that the Superintendent intended to call only four of the eleven witnesses identified in the three Notices. (*Id.* ¶ 95.) The Superintendent reserved the right, however, to call any of the other witnesses at the Hearing if he found their testimony to be necessary. (*Id.*) That day, plaintiff's advisor responded: "My sense . . . is that the [Superintendent] will only be calling witnesses that he believes help make the case that [plaintiff] is guilty of the charges." (ECF No. 3-1 at 28.) The advisor also raised concerns about the Superintendent's role as both prosecutor for the Academy and "impartial" judge. (Compl. ¶ 97.) He cited SI 2016-02, which provides that "the accused has the 'right to an investigation and disciplinary process conducted in a manner that . . . is not conducted by individuals with a conflict of interest,'" and continued, "[i]t seems obvious to me that being both prosecutor and judge is an inherent conflict of interest." (ECF No. 3-1 at 28.)

On February 8, 2018, plaintiff's counsel submitted an 11-page letter objecting to the Academy's policies, procedures, and protocols on the basis that they were

fundamentally unfair and provided insufficient due process. (Compl. ¶ 98.) Plaintiff's objections included:

- Proceeding with the Hearing in the face of a law enforcement determination that there was no probable cause to believe Plaintiff engaged in nonconsensual sexual activity or contact with the Complainant;

- Proceeding by way of a Superintendent's Disciplinary Hearing under the SA/SH Procedures instead of an Executive Board;

- The Superintendent's conflicting roles as "advocate" for the Academy, "neutral judge" presiding over the proceedings, and "jury" determining the facts;

- Prohibiting counsel's right to participate in the Hearing;

- Prohibiting counsel's presence in the Hearing room;

- The Complainant's presence in the Hearing room throughout the proceedings;

- Prohibiting Plaintiff from directly questioning the Complainant;

- The Superintendent's decision not to call exculpatory witnesses;

- Consideration by the Superintendent of unsworn statements contained in the investigation report;

- Consideration of photographs of purported bruises to the Complainant's legs;

- The Superintendent's access of the entire investigation report;

- The Academy's failure to obtain critical evidence during the investigation;

- The failure of statements in the investigation report to be in the first person as required by Academy rules and regulations;

- The failure to provide Plaintiff with the training records of those who investigated and adjudicated the charges against him;

- Restrictions imposed on Plaintiff as to the use and disclosure of the contents of the investigation file.

(*Id.*; ECF No. 3-1 at 39-49.)

4. The Hearing, Phase I

The Hearing began on Friday, February 9, 2018, at approximately 10:15 a.m., and concluded at approximately 9:45 p.m. that night. (Compl. ¶¶ 99, 115; Helis Decl. ¶ 21.) There were brief pauses and a short lunch break during the Hearing. (Compl. ¶ 99.) The parties contest whether the Superintendent provided a dinner break. (*Id.*; Helis Decl. ¶ 21.) The entire proceeding was recorded. (Compl. ¶ 99.)

Plaintiff was present with his faculty advisor and counsel throughout the proceeding. (*Id.* ¶ 100.) Two attorneys represented plaintiff, but the Academy permitted only one attorney to be present in the hearing room. (*Id.*) The Superintendent questioned witnesses on behalf of the Academy, presided over the Hearing, acted as fact-finder, made the determination as to whether plaintiff violated the Academy's rules, and decided his penalty. (*Id.* ¶ 101; *see also* SA/SH Procedures at 3-4.)

The Hearing began with a "summary rejection" of plaintiff's 11-page objection letter, with no further explanation. (*Id.* ¶ 102.) Plaintiff, his advisor, and

Complainant gave opening statements. (*Id.* ¶ 103.) The Superintendent then called Complainant to testify and questioned her regarding the allegations. (*Id.*) According to the complaint, the Superintendent posed questions in a "neutral, non-confrontational manner, even after [Complainant] provided obviously false and inconsistent testimony." (*Id.*) The Superintendent prohibited plaintiff from questioning Complainant directly. (*Id.* ¶ 104.) Instead, plaintiff submitted a list of cross-examination questions to the Superintendent. (*Id.*) The complaint states that the Superintendent "refused to ask the Complainant questions that would have revealed her lack of credibility, including those concerning her relationship with . . . the 'Friend.'" (*Id.*) The Superintendent elicited hearsay testimony from Complainant regarding her conversations with law enforcement. (*Id.* ¶ 105.) The complaint alleges that Complainant suggested that the criminal investigation had not been closed, and was not active "because she had not definitively stated she wanted to pursue charges." (*Id.*) According to the complaint, Complainant's testimony was "contradictory, inconsistent with statements she made previously, inconsistent with the testimony of others, changed repeatedly, and was replete with falsehoods." (*Id.* ¶ 106.)

Ten hours into the Hearing, after plaintiff had examined ten witnesses, the Superintendent called plaintiff to testify. (*Id.* ¶ 107.) According to the complaint, he "vigorously and aggressively" cross-examined plaintiff, "questioning his version of events and his judgment on the night in question." (*Id.* ¶ 108.) Plaintiff alleges that the Superintendent "had not acted in the same manner towards the Complainant." (*Id.*)

According to the complaint, Complainant's sister "declined to appear" to testify. (*Id.* ¶ 109.) The Superintendent asked plaintiff to speculate as to why Complainant's sister wanted Complainant to sleep in the same room as her even though, based on plaintiff's testimony, it was clear that he had not discussed this with the sister and "was unaware of her view." (*Id.*)

The complaint also alleges that the Superintendent aggressively cross-examined plaintiff on a misstatement of the record regarding a fellow midshipman's warning that Complainant was intoxicated, even though that midshipman testified at the Hearing that he had no opinion as to her level of intoxication. (*Id.* ¶ 110.) That midshipman testified that he did not know how much, if anything, Complainant drank that night, and that he had not said anything about it to plaintiff. (*Id.*)

The Superintendent cross-examined plaintiff regarding his own level of intoxication, focusing on the number of drinks plaintiff had consumed without regard to the amount of time. (*Id.* ¶ 111.)

According to the complaint, the Superintendent elicited hearsay statements that law enforcement officers had made to Complainant, but precluded similar testimony as "impermissible hearsay" when plaintiff's counsel sought to testify regarding (1) plaintiff's candor and truthfulness during his voluntary interview with the Detective, and (2) the fact that the law enforcement investigation had been closed. (*Id.* ¶ 112.)

Counsel for the Academy had indicated that breaks would be permitted during plaintiff's testimony as long as there was no pending question. (*Id.* ¶ 113.) Regardless, according to the complaint, the Superintendent refused multiple requests for breaks, including a dinner break over six hours after the end of the lunch break. (*Id.*)

According to the complaint, plaintiff was "honest and forthright" in his testimony, which was "consistent with his prior statements and was corroborated by other

witnesses and documentary evidence." (*Id.* ¶ 114.)

The Superintendent called three witnesses—namely, Complainant and two midshipmen. (*Id.* ¶ 116.) According to the complaint, the Superintendent believed these midshipmen "would support the charges." (*Id.*) He did not call Complainant's sister or "any of the many midshipmen who had interacted with and observed the Complainant on the night in question." (*Id.*) According to the complaint, plaintiff "was forced" to call seven witnesses, six of whom were midshipmen who testified about their interactions with or observations of Complainant the night of the Ring Dance. (*Id.* ¶ 117.) These witnesses provided exculpatory evidence "proving the Complainant was not intoxicated to the point of being unable to consent to sexual activity, she willingly engaged in sexual activity with Plaintiff, and she lied during her testimony" at the Hearing and in her statement to Thomas. (*Id.*) Plaintiff was also forced to call Thomas, who had conducted the Academy's investigation. (*Id.* ¶ 118.)

According to the complaint, plaintiff found the Hearing procedures to be "physically and emotionally overwhelming and grueling." (*Id.* ¶ 119.) The Hearing lasted for nearly twelve hours, during which plaintiff, with "absolutely no legal training," "serve[d] as his own attorney throughout, giving opening and closing statements, making legal and factual arguments and objections, and examining witnesses, all in addition to having to testify and being subjected to vicious cross-examination by the Superintendent." (*Id.*)

At the end of the day, the Hearing was adjourned until Monday, February 12, 2018, for the Superintendent's decision and, if necessary, the punishment phase of the proceeding. (*Id.* ¶ 120.) The Hearing reconvened on February 12, 2018, at 10:00 a.m., and the Superintendent rendered his decision, finding that plaintiff had violated SI 2016-02 and Midshipman Regulations paragraph 243(a). (*Id.* ¶ 121.) He dismissed the paragraph 243(b) charge as redundant, and dismissed the paragraph 204(f) charge (that plaintiff failed to prevent the underage Complainant from drinking unlawfully or irresponsibly). (*Id.*) According to the complaint, the Superintendent issued no findings of fact and never explained the basis for his decision. (*Id.* ¶ 122.)

5. The Hearing, Phase II

Immediately after rendering his decision, the Superintendent began the punishment phase of the proceedings. (*Id.* ¶ 123.) Plaintiff was permitted to call only five character witnesses, even though neither the Midshipman Regulations nor the SA/SH Procedures requires this limitation. (*Id.*) The Superintendent also questioned plaintiff again. (*Id.*) Complainant was permitted to make a victim impact statement. (*Id.* ¶ 124.) The Superintendent did not question her, and plaintiff was not permitted to do so. (*Id.*)

The Superintendent adjourned this phase of the Hearing to deliberate. (*Id.* ¶ 125.) After approximately two hours, plaintiff was notified that the Superintendent had additional questions for plaintiff. (*Id.*) The Superintendent did not, however, appear to ask these questions and, after another hour, reconvened the Hearing and pronounced plaintiff's punishment without asking further questions. (*Id.* ¶¶ 125-26.) The Superintendent suspended plaintiff for the rest of the academic year (referred to as a "setback"), or one nine-week term. (*Id.* ¶ 127.) In reality, however, the remaining classes plaintiff needs to complete to graduate are offered only during the third term each year and, therefore, his punishment amounted to a year-long suspension. (*Id.* ¶ 128.)

According to the complaint, plaintiff was informed that he was not entitled to appeal the Phase I decision or Phase II punishment; his only recourse was to seek reconsideration by the Superintendent. (*Id.* ¶ 129.)

### 6. The Reconsideration Application

Plaintiff submitted a notice of intention to seek reconsideration of the Superintendent's decisions in both phases. (*Id.* ¶ 130.) Plaintiff's notice stayed the setback, so he was permitted to remain on campus, complete his second term courses and finals, and begin the third term, which started on March 9, 2018. (*Id.* ¶ 131.)

On March 2, 2018, plaintiff's counsel submitted plaintiff's application for reconsideration. (*Id.* ¶ 132.) His application included the following: additional character letters, a letter from plaintiff "addressing what he learned from this process, raising concerns about the punishment imposed, and suggesting alternative punishments," a letter from plaintiff's parents regarding the financial hardship they experienced due to the Hearing, a letter from plaintiff's faculty advisor regarding the impact of the punishment on plaintiff's ability to complete his requirements for graduation, and a copy of counsel's February 8, 2018 objection letter. (*Id.*) Plaintiff's application raised objections to the finding of guilt, the lack of due process as a result of the Hearing procedures, the findings that he argued were against the weight of the evidence and inconsistent with law enforcement findings, and the Superintendent's failure to apply the relevant definition of consent from SI 2016-02. (*Id.* ¶ 133.) Plaintiff expressed his concerns that the punishment would impact his ability to "successfully complete his studies" and obtain his degree, mariner's license, and military commission. (*Id.* ¶ 134.) He proposed alternative punishments that he believed would have a more positive impact on the Academy and his classmates. (*Id.*)

On March 20, 2018, the Superintendent issued a decision denying plaintiff's request for reconsideration, without explanation. (*Id.* ¶ 135.) Plaintiff had completed 20% of his final term. (*Id.*) He was required to complete check-out procedures and depart immediately on a "leave of absence," and returned home. (*Id.* ¶¶ 136-37.)

## C. The Superintendent's Declaration

The Superintendent submitted a declaration along with defendants' memorandum of law in opposition to plaintiff's motion for injunctive relief. In his declaration, the Superintendent describes his position at the Academy, including his role in disciplinary proceedings. He explains that the Superintendent is responsible for "all programs, activities and facilities at the Academy, including the academic and regimental programs." (Helis Decl. ¶ 1.) As Superintendent, he is authorized to issue regulations necessary for the accomplishment of the Academy's mission, which include the Superintendent Instructions and other policies and directives. (*Id.* ¶ 6.) The Superintendent describes the Academy's Midshipman Regulations as the "student code of conduct," and explains that when midshipmen violate these regulations or other Academy policies, they can be charged with violations ranging from Class III (least egregious) to Class I (most egregious). (*Id.* ¶ 7.)

According to the declaration, the Superintendent is responsible for holding a Superintendent's Hearing when midshipmen are charged with Class I violations. (*Id.* ¶ 8.) Violations of SI 2016-02 (the sexual assault/harassment policy) constitute Class I violations, "[g]iven the nature of such misconduct allegations," and, therefore, it is Academy policy for the Superintendent to hear these cases. (*Id.*) The Superintendent explains that the procedures in Superintendent's Hearings and Executive

Board Hearings are "substantially similar," and that "each affords the same due process protections." (*Id.*) During his time at the Academy, the Superintendent has held six other sexual assault hearings. (*Id.* ¶ 30.) He exonerated one student of the alleged sexual assault, and found the other five had violated the Academy's policy against sexual assault and disenrolled them. (*Id.*)

The Superintendent also describes the procedures applied in these cases generally, and in plaintiff's case in particular. He first sets forth a brief overview of the underlying facts in plaintiff's case, the criminal investigation, and the Academy's investigation. (*Id.* ¶¶ 9-12.) The Superintendent explains that, in plaintiff's case, he reviewed the Deputy Superintendent's decision on January 10, 2018 to set the Hearing for January 19, 2018, and found that the 60-day extension plaintiff requested was "unacceptable," but agreed to an extension to January 26, 2018. (*Id.* ¶ 13.) He disagreed with plaintiff that "there was no urgency to the hearing as Complainant was not a student at the Academy," in light of the severity of the allegations. (*Id.*) According to the declaration, plaintiff's attorneys were not available on the new Hearing date, so the Hearing was rescheduled to February 9, 2018. (*Id.* ¶ 15.)

The Superintendent explains that, like Executive Board Hearings, Superintendent's Hearings have two phases. (*Id.* ¶ 16.) During Phase I, the Superintendent applies a preponderance of the evidence standard in determining whether the midshipman committed the charged misconduct. (*Id.*) The Superintendent determines the "appropriate discipline" at Phase II. (*Id.*)

With regard to the witnesses in plaintiff's case, the Superintendent asserts that he determined that he "did not need to hear from" seven of the witnesses identified in the Investigation Report because, "based on

summaries of their interviews, they did not have first-hand knowledge of the alleged misconduct." (*Id.* ¶ 17.) He asked Academy counsel to inform plaintiff of this decision, and that plaintiff could include any of those individuals that he wanted to call to testify on his witness list. (*Id.*) Plaintiff included four of the seven witnesses on his list for Phase I, and one on his list for Phase II, all of whom testified in their respective phases. (*Id.*)

The Superintendent states that he learned prior to the Hearing that Complainant's sister was unavailable to attend because she was away at college. (*Id.* ¶ 18.) The Superintendent further asserts that, upon information and belief, Academy counsel relayed to plaintiff's attorneys his message that the sister could testify at the Hearing by telephone. (*Id.*) Plaintiff's attorneys did not consent and, thus, the sister did not testify. (*Id.*)

The declaration explains that, during a Superintendent's Hearing, a midshipman's attorney may consult with and advise his client, but cannot otherwise participate. (*Id.* ¶ 19.) The Superintendent states that plaintiff's attorney and his faculty advisor consulted with and advised him "throughout" both phases of his Hearing. (*Id.*) In Executive Board Hearings, on the other hand, an accused may have an attorney present only if he or she is also criminally charged for the conduct at issue in the Academy proceeding. (*Id.*) Plaintiff, therefore, would not have been permitted to have an attorney present had his case instead been heard by an Executive Board. (*Id.*) The Superintendent notes that Complainant was accompanied by counsel during Phase I, but not Phase II of the Hearing (counsel was not available during Phase II). (*Id.* ¶ 20.)

The Superintendent states that he began plaintiff's Hearing by explaining that he was not persuaded by the arguments in plaintiff's attorneys' February 8, 2018 letter. (*Id.* ¶ 21.)

He asserts that he provided breaks, including a dinner break, although the on-campus cafeteria was closed at that time. (*Id.*) Academy counsel had informed plaintiff's attorneys that the Hearing could continue past the end of the business day. (*Id.*)

According to the declaration, plaintiff spent almost an hour questioning the Friend. (*Id.* ¶ 22.) The Friend answered questions about his disciplinary records—including that he was currently on restriction for misconduct—about the state of his past and current friendship with plaintiff, and about his relationship with Complainant. (*Id.*) The Superintendent prohibited questions regarding the Friend's "sex life," which he states "was consistent with [his] not allowing [such] questions" regarding Complainant or others. (*Id.*) The Superintendent reviewed a recording of the Hearing and asserts that plaintiff's attorney audibly directed plaintiff to ask certain questions of the Friend that plaintiff can be heard refusing to ask. (*Id.* ¶ 23.)

Plaintiff began calling witnesses at approximately 5:00 p.m., and the Superintendent permitted the testimony of all of his witnesses except his attorney, Gerald Lefcourt. (*Id.* ¶ 24.) Plaintiff informed the Superintendent that Lefcourt would testify that the Detective found plaintiff to be credible. (*Id.*) The Superintendent states that he precluded this testimony because "as the presiding official, I assess credibility, and the opinions of others as to credibility are not relevant." (*Id.*)

According to the declaration, plaintiff was "ably assisted" by his attorney and faculty advisor. (*Id.* ¶ 25.) They all had identical, approximately 3-inch binders with questions prepared for plaintiff to ask witnesses, and counsel "appeared to frequently direct Plaintiff's attention to specific questions" for him to ask. (*Id.*) Counsel and the faculty advisor frequently whispered to plaintiff. (*Id.*)

Plaintiff provided the Superintendent with a ten-page typed list of questions for him to ask Complainant, along with some handwritten questions. (*Id.* ¶ 26.) The Superintendent states that he asked "most of the questions," but "declined to ask" those relating to Complainant's sexual activity.[10] (*Id.*) He also accepted additional follow-up questions from plaintiff after Complainant answered the first set of questions, and again asked those he deemed relevant. (*Id.*)

In arriving at his adverse decision at the conclusion of Phase I, the Superintendent states that he "considered all the documentation and witness testimony, as well as [plaintiff and his advisor's] lengthy opening and closing statements." (*Id.* ¶ 28.) In his deliberations as to plaintiff's punishment, the Superintendent considered the Phase II testimony by plaintiff, his advisor, and plaintiff's five character witnesses, Complainant's impact statement, plaintiff's overall academic, Regimental, and disciplinary record, and twenty-three written statements of support for plaintiff. (*Id.* ¶ 29.) The Superintendent determined that plaintiff "should be set back to the Class of 2019, subject to terms and conditions of probation for his rehabilitation, which would be supervised by an Academy mentor." (*Id.*)

The Superintendent explains that the Academy's academic calendar "is not as flexible as those at most universities," and that many courses are offered in sequence,

---

[10] SI 2016-02, attached to the Superintendent's declaration, specifies that the rights of the accused and victim in disciplinary proceedings include: "The right to exclude prior sexual history . . . from admittance in Phase I (determination stage) . . . . Past sexual violence findings may be admissible Phase II . . . ." (SI 2016-02 at 6.)

and at limited times. (*Id.* ¶ 33.) As a result, when a midshipman goes on a leave of absence "for any reason," that student "normally" returns the next year at the start of the same term during which he or she departed. (*Id.*) The Superintendent explains that this is the reason that Academy policy is *not* to suspend a student during disciplinary proceedings, but rather to "move[] forward as expeditiously as possible while insuring that any accused Midshipman is afforded his/her due process protections." (*Id.*) Midshipmen are then expected to comply immediately with the decision once it is made. (*Id.*)

In the declaration, the Superintendent also notes that plaintiff ignored his multiple admonitions at the Hearing not to share information about the proceedings with "anyone outside the room," including through social media. (*Id.* ¶ 35.) Plaintiff sent three messages to his classmates via Facebook, stating: (1) during the break between phases, that plaintiff was "found guilty of sexual assault and now [a]wait[s] punishment from [the Superintendent]" (ECF No. 14-5); (2) after Phase II, that he planned to "appeal and fight [his setback] with every ounce of strength that I have" (ECF No. 14-6); and (3) also after Phase II, that, "for those who haven't heard the superintendent has ruled that I committed a serious class 1 violation" (ECF No. 15). In a separate disciplinary proceeding, plaintiff was found to have committed a Class I violation for failing "to comply with the specific orders of a commissioned officer or superior" by posting these messages, despite the Superintendent's orders. (*Id.* ¶ 36.)

The Superintendent states that the Academy "has a significant interest in ensuring that it bestows a diploma on an individual who has not only complied with all of its graduation requirements . . . but also is of exemplary character. The Academy owes it to the taxpayers who fund the education of the Midshipmen at the Academy to only graduate those who have so complied, and who will serve their obligation with distinction." (*Id.* ¶ 37.)

D. Procedural History in the Instant Action

On March 28, 2018, plaintiff filed the complaint in this action, as well as a motion for a preliminary injunction. At a hearing that afternoon, plaintiff also requested a temporary restraining order permitting plaintiff to attend classes in advance of the preliminary injunction hearing. The parties submitted letters regarding the request for a temporary restraining order on March 29, 2018. The Court held a telephone conference on March 30, 2018, and declined to grant plaintiff's motion for a temporary restraining order at that time, but moved the preliminary injunction hearing from April 6 to April 4, 2018, in light of plaintiff's concerns about missed classes. Defendants filed their opposition on April 3, 2018, which included a memorandum of law as well as the declaration by the Superintendent discussed *supra*.

The Court held the preliminary injunction hearing on April 4, 2018. Prior to the preliminary injunction hearing, the government provided the Court with an audio recording of the Academy Hearing, but had not yet prepared a transcript. On April 5, 2018, the Court granted plaintiff a temporary restraining order in light of its finding that, in its absence, plaintiff would suffer irreparable harm while awaiting the Court's decision (which would follow the Court's review of the transcript of the disciplinary proceeding). The temporary restraining order stayed any disciplinary action by the Academy and permitted plaintiff to attend classes until the Court issued its preliminary injunction decision. At the Court's direction, on April 10, 2018, the government filed a copy of the transcript of the Academy Hearing under seal. The government also provided an

unredacted copy of the administrative record. The Court has now reviewed the administrative record, including the transcript of the Hearing, and has fully considered all of the arguments and submissions of the parties.

## II. STANDARD OF REVIEW

"The preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies.'" *Grand River Enters. Six Nations, Ltd. v. Pryor*, No. 02–CV–5068, 2006 WL 1517603, at *6 (S.D.N.Y. May 31, 2006) (quoting *Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)). In order to prevail on a motion for a preliminary injunction, a party must establish: "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, LLC v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (quoting *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002)). A preliminary injunction is generally not appropriate where monetary damages will serve as adequate compensation. *See Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989); *Abish v. Nw. Nat'l Ins. Co. of Milwaukee, Wis.*, 924 F.2d 448, 454 (2d Cir. 1991) ("In a few instances, however, we have recognized exceptions to this general rule and found irreparable harm where a party sought only money damages." (citations omitted)).

Under the first prong of the test, "[t]o establish irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Id.* (citations omitted). With regard to the second prong, where a party seeks a preliminary injunction that will affect governmental action "taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (citations omitted); *accord, Lynch v. City of New York*, 589 F. 3d 94, 98 (2d Cir. 2009). Further, where the movant seeks an injunction that will alter the status quo (a "mandatory" rather than "prohibitory" injunction), the party must make a "'clear' or 'substantial' showing of a likelihood of success on the merits.'" *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (citation omitted).

## III. DISCUSSION

For the reasons set forth below, the Court finds that plaintiff fails to meet the second prong of the preliminary injunction standard—that is, likelihood of success on the merits.[11] Plaintiff has asserted claims under the APA and the Due Process Clause, alleging both substantive and procedural due process violations. As discussed below, the Court concludes that the second prong is not met because: (1) plaintiff has failed to show that defendants' actions were arbitrary and capricious, or otherwise in violation of the APA; and (2) plaintiff has failed to demonstrate that defendants violated his procedural or substantive due process rights

---

[11] Given that plaintiff seeks a preliminary injunction that will affect governmental action "taken in the public interest pursuant to a statutory or regulatory scheme," the Court will grant a preliminary injunction here only on finding a likelihood of success on the merits. The Court need not consider, on finding plaintiff unlikely to succeed, whether this case presents sufficiently serious questions going to the merits to make them a fair ground for litigation. In any event, even assuming *arguendo* that the lower standard applied, the Court would still conclude the standard is not met for the reasons discussed herein.

in connection with the disciplinary proceeding.[12]

A. Administrative Procedure Act

1. Applicable Law

Plaintiff challenges the Superintendent's decisions under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Defendants are agents under the APA, 5 U.S.C. § 701, and the APA provides that agency action is subject to judicial review when it is "final" and there is "no other adequate remedy in a court," *id.* § 704. "[T]he Administrative Procedure Act provides that '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof,' unless review is precluded by statute or the complained-of decision was committed to agency discretion." *Ruiz v. Mukasey*, 552 F.3d 269, 273 (2d Cir. 2009) (quoting 5 U.S.C. § 702).

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See* 5 U.S.C. § 706(2)(A). Under this standard, "the scope of review is . . . narrow, and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The agency's decision is "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection

between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Accordingly, an agency action is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 42.

2. Analysis

Plaintiff argues that he is entitled to a preliminary injunction under the APA on the grounds that the Academy "failed to follow its own rules, policies, procedures and regulations and denied Plaintiff his due process rights," and "[this] failure . . . was arbitrary and capricious." (Pl. Mem. at 24.) Defendants argue that (1) they did, in fact, follow their policies and procedures, and (2) their decision was not arbitrary, capricious, or contrary to law. For the following reasons, based on its review of the record, the Court agrees with defendants and concludes that plaintiff has no likelihood of success on this claim.

The Court first notes that defendants are entitled to deference with regard to their policies, which were enacted in accordance with 46 U.S.C. § 51318 and other regulatory authority governing the Academy's operations. In *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, the Supreme Court established a two-step process for courts to follow in determining whether an agency's interpretation of its

---

[12] The preliminary injunction standard requires that both prongs be met, thus, the Court need not conduct an analysis of irreparable harm in light of its

determination that plaintiff failed to demonstrate a likelihood of success on the merits.

regulations or governing statutes is entitled to deference:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute . . . . Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. 837, 842-43 (1984). Courts are bound to accept an agency's interpretation of its governing statute unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Couer Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261, 278 (2009).

Pursuant to 46 U.S.C. § 51318(a), requiring the Superintendent to "prescribe a policy on sexual harassment, dating violence, . . . [and] sexual assault" for Academy students and personnel, the Superintendent promulgated SI 2016-02, the Academy's "Sexual Assault, Dating Violence, Domestic Violence, Stalking, Prevention Education, and Response Policy." This is not a case where the statute was "silent or ambiguous with respect to the specific issue" and the court must look to the agency's interpretation for guidance. *Chevron*, 467 U.S. at 843. The statute specifies the matters to be covered by this policy, including a procedure for disciplinary action, as well as sanctions to be imposed in these types of cases. 46 U.S.C. § 51318(a). Following this statutory

mandate, the Superintendent established the Academy's sexual assault policy, which includes the procedures that the Superintendent enforced during the Hearing and which plaintiff challenges under the APA. The policies and procedures that the Superintendent promulgated and followed at the Hearing were, therefore, entitled to deference.

In their opposition, defendants identify the following as plaintiff's only claims that defendants did not follow their own policies: (1) plaintiff's Hearing was not before an Executive Board, as provided for under the Midshipman Regulations, and (2) plaintiff was prohibited from cross-examining Complainant, even though the rules "explicitly" allow him to do so. (Def. Mem. at 18 (citing Compl. ¶ 92; Pl. Mem. at 20).) The parties also dispute whether the Superintendent followed the Academy's policies by applying the SI 2016-02 definition of consent in determining that plaintiff had committed the charged sexual assault. Defendants argue that any other allegations that they failed to follow their own policies are not rooted in the actual policies, or are simply based on plaintiff's interpretation of those policies.

First, plaintiff's assertion that, under existing rules and policies, he was entitled to an Executive Board Hearing, rather than a Superintendent's Hearing, is incorrect. As noted above, pursuant to statute, the Superintendent promulgated policies and procedures, including SI 2016-02 and the SA/SH Procedures, for disciplinary proceedings involving charges of, among other things, sexual assault. SI 2016-02 specifically states that "the Academy may pursue an administrative investigation and disciplinary proceedings against an accused Midshipman pursuant to the Midshipman Regulations *and/or* [the SA/SH Procedures]." (SI 2016-02 at 5.) Thus, it is

clear that the Superintendent was authorized to use these procedures (including the Superintendent's Hearing) for this disciplinary proceeding involving charges of sexual assault, rather than the Executive Board procedure that was utilized for other types of disciplinary proceedings. In short, the use of the Superintendent's Hearing in this case is completely consistent with the Academy's policies and procedures.

As to plaintiff's second claim, regarding his inability to cross-examine Complainant, the Superintendent provided him the required opportunity for such questioning under the Academy's policies and procedures. In particular, although he did not allow plaintiff to personally cross-examine Complainant, the Superintendent accepted plaintiff's lengthy list of prepared written questions, and written follow-up questions, and asked those questions that the Superintendent deemed relevant to the proceeding. (*See* Tr. I[13] at 64-66 (plaintiff submits ten pages of written questions for the Superintendent to ask Complainant on cross-examination, and the Superintendent asks questions based on this list); *id.* at 85-87 (the Superintendent asks plaintiff's follow-up written questions during cross-examination of Complainant).) This use of written questions for cross-examination of Complainant was completely consistent with the SA/SH Procedures, which state: "It is preferred that witnesses appear in person. However, given the nature of the allegations of misconduct, the Superintendent may direct that the testimony be provided by one or more witnesses by alternative means, such as remotely via VTC, behind a screen or through written

questions." (SA/SH Procedures at 3.) Here, even though Complainant appeared in person, it was not a violation of the rules to require cross-examination of Complainant through the Superintendent, and this process did not impact the fairness of the proceeding in any way. The SA/SH Procedures provide accused midshipmen the right "to question all witnesses" (SA/SH Procedures at 2), but do not state that this right is without limitations. Instead, the Superintendent is expressly authorized to omit certain questions: for instance, SI 2016-02 makes clear that the victim has the right to exclude prior sexual history. (SI 2016-02 at 6).

Finally, plaintiff argues that the Superintendent did not apply the definition of consent established in SI 2016-02 and, therefore, wrongly found that he committed sexual assault. Under SI 2016-02, "[a]ssent shall not constitute consent if it is given by a person who is *unable to lawfully* give his or her consent because of . . . intoxication." (SI 2016-02 at 3.) Plaintiff argues that the Superintendent based his determination that Complainant had not consented on the fact that she had been drinking, not on a finding that she had been intoxicated to the point that she was unable to lawfully consent. Plaintiff asserts that a lesser degree of impairment would not suffice to support a finding that he had violated the Academy's sexual assault policy. Plaintiff argues that the Superintendent did not state the basis for his Phase I decision, and further asserts that it appears the Superintendent applied a different definition of consent, and, in doing so, failed to follow Academy policy.

---

[13] The government has provided the Court with a hard copy of the transcript of the Academy Hearing under seal, and will file a redacted copy once it is available. The citations here are to different volumes of the transcript: "Tr. I" refers to the portion of the transcript from the first half of Phase I of the Hearing, held on February 9, 2018, beginning at 10:14 a.m. "Tr. II" refers to portion of the transcript from the remainder of Phase I, which began at 3:30 p.m. the same day. Additional volumes contain the portions of the transcript from Phase II of the Hearing, held on February 12, 2018.

Based on its review of the transcript of the Hearing, the Court disagrees. Although the Superintendent asked questions about the extent of Complainant's drinking, at no point in the Hearing did he suggest that he was applying some lesser degree of impairment with respect to the definition of consent. In fact, the faculty advisor made this standard extremely clear during his opening statement, and the Superintendent did not, in any way, contest the standard. (*See, e.g.*, Tr. I at 27-29 (plaintiff's faculty advisor emphasizing the definition of "consent" in SI 2016-02, Section 5, Subsection E).) Plaintiff reiterated the standard in detail in his closing statement (Tr. II at 188-89), without the Superintendent noting (at any point) any disagreement with plaintiff's summary. Moreover, as discussed *infra*, there was more than sufficient evidence (if Complainant's testimony was credited) for that standard to be met—namely, that Complainant was so intoxicated that she could not lawfully consent. Accordingly, plaintiff has failed to demonstrate, based on the evidence adduced at the Hearing or statements by the Superintendent, that the Superintendent misunderstood or misapplied the relevant legal standard under the Academy's policies and procedures.

As agency actions, and even more as actions by the U.S. Merchant Marine Academy, the policies that the Superintendent promulgated and applied at the Hearing were entitled to deference: "Few decisions properly rest so exclusively within the discretion of the appropriate government officials [as] the selection training, discipline and dismissal of the future officers of the military and Merchant Marine." *Wasson v. Trowbridge*, 382 F.2d 807, 812 (2d Cir. 1967); *see also Andrews v. Knowlton*, 509 F.2d 898, 904 (2d Cir. 1975) (discussing the deference to military proceedings in light of the "constitutional permissibility of the military to set and enforce uncommonly high standards of conduct and ethics"). In this case, defendants followed policies that were enacted pursuant to a clear congressional directive.

With respect to the decision itself, the Court concludes that there is no likelihood that plaintiff can demonstrate that it was arbitrary and capricious. As discussed *supra*, courts are highly deferential in determining whether agency action was arbitrary and capricious: they are to examine the relevant data and articulate a satisfactory explanation for the action, but still conduct a narrow review, rather than substitute their judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. Here, the Superintendent found in Phase I that plaintiff had committed the charged misconduct after "considering all the documentation and witness testimony, as well as [plaintiff and his advisor's] lengthy opening and closing statements." (Helis Decl. ¶ 28.) As defendants correctly argue, this administrative hearing is not a criminal proceeding, and the Court finds it to be sufficient that the Superintendent applied a preponderance of the evidence standard during Phase I. (Helis Decl. ¶ 16; *see also* SA/SH Procedures at 4 ("The Superintendent will evaluate the facts and determine whether the charge(s) as set forth in the Notice are sustained . . . [and] consider all the data available . . . to arrive at an objective determination as to whether Respondent committed the violations as charged.").)

Having reviewed the transcript, the Court concludes there was more than sufficient evidence to support the Superintendent's decision, if he credited Complainant's testimony. In particular, Complainant testified that plaintiff continually brought her alcoholic drinks throughout the night of the dance. (*See, e.g.*, Tr. I at 34 (at the dance, plaintiff brought Complainant a drink at the cocktail hour and "kept bringing me drink after drink of whatever . . . drink he brought

22

me in the first place"); *id.* at 35 (On the balcony after the dance, "[plaintiff] told me that he had bought special bottles for the two of us, and asked me if I would like to try any, so . . . I was sitting there, I was very dazed and confused and he said that I should try it since he bought it for us. So I tried some at that point."); *id.* at 36 (on the balcony, "he brought the glass that I had earlier and poured whatever beverage that he had in my mouth"); *id.* at 86 (plaintiff continually brought Complainant drinks one after another the entire night, and she was never without a drink).)

Complainant further testified to having obvious manifestations of severe intoxication at various times during the dance, on the balcony after the dance, and in plaintiff's room. (*See, e.g.*, *id.* at 35 (at the dance, "I remember that I started to feel really sick and I kept sitting down because I was hot and very dizzy"); *id.* at 35 ("after we left [the dance], I really couldn't walk, so he helped me out while we walked back to the hotel and he dropped [me] off in my room, and I was with my sister, and we changed our dresses into something else and then, he came back, and I was sitting on the balcony"); *id.* at 36 (after additional drinking on the balcony with plaintiff, "I remember stumbling into the room and I lay down on the couch in the room, which is where I would be sleeping that night [in a room with her sister and Friend]"); *id.* at 37 (while plaintiff spoke with sister, Friend, and others about Complainant sleeping in his room, "I was still laying on the couch, coming in and out of consciousness"); *id.* (After Complainant accepted plaintiff's offer to sleep in his hotel room, "he rolled my luggage out and I barely even remember just getting to the room but, I remember taking

one step in and just laying face down on the bed. And I remember the phone ringing but I was passed out . . . ."); *id.* at 37-38 (Once in plaintiff's hotel room, "I barely remember what was going on or . . . what was happening but, he then pulled off my dress and I was still face down which I assume he was taking off his own clothes and grabbed me by the legs and flipped me over which would explain why I have bruises all over my legs the next day . . . and then I just remember him being on top of me but, I felt powerless like . . . I didn't really know what was going on. And I was just in and out of consciousness and then, I remember at one point being faced down again and my legs were hanging off the bed. And . . . the next thing I knew I was . . . I woke up in a different outfit, in shorts and a tank top.").)

Moreover, Complainant's testimony was corroborated by some of the other witnesses, especially the Friend. (*See, e.g.*, *id.* at 110-17, 122 (Friend testifying to Complainant having a number of drinks throughout the night with plaintiff); *id.* at 118 (Friend testifying that Complainant was "obviously, drunk" at the dance); *id.* at 120 (Friend testifying that group of midshipmen and dates, including Complainant, were tripping or stumbling going back to hotel after dance); *see also* Tr. II at 3 (Friend testifying that Complainant had at least four drinks and had a drink in her hand the entire night).) In fact, the Friend testified that he told plaintiff, in front of others, that Complainant was too drunk to have sexual intercourse and that, if they had intercourse, "it w[ould] be date rape," and plaintiff re-assured him, "I know, dude. I'm just gonna take care of her."[14] (Tr. I at 126-27.)

[14] Other witnesses confirmed that the Friend gave plaintiff this warning. (*See, e.g.*, Tr. II at 54 (cadet testifying he was present when Friend told plaintiff that Complainant was "too drunk to consent").) During his testimony, plaintiff acknowledged that the Friend told him that Complainant was too drunk to consent to sexual intercourse, but he believed that assessment was incorrect and that she was able to consent. (*See, e.g.*, Tr. II at 154 (Plaintiff testifies that Friend stated, "[Y]ou can't have sex with her. She's

Although plaintiff testified contrary to Complainant's assertions, and called other witnesses in an attempt to dispute her version of events, the Superintendent was entitled to weigh the evidence and resolve these credibility issues. Based on Complainant's testimony and the record overall, there is simply no likelihood that plaintiff could demonstrate that the Superintendent's decision finding that he violated the Academy's sexual assault policy was arbitrary or capricious.

Similarly, with respect to the punishment phase, the Superintendent based his decision on a review of documentary evidence including testimony by plaintiff, his advisor, and character witnesses, plaintiff's overall academic, Regimental, and disciplinary record, and twenty-three written statements of support for plaintiff. (Helis Decl. ¶ 29.) The Superintendent then imposed what he determined to be the "appropriate discipline" based on his review of all of this evidence: a "setback," under which plaintiff would be permitted to resume classes, graduate, and take his licensing exam in 2019. Plaintiff has failed to point to any aspect of the punishment that was arbitrary or capricious under the APA.

In sum, the Superintendent based his decision on a review of testimonial and documentary evidence from multiple witnesses with regard to the allegations of sexual misconduct. The Superintendent conducted a nearly twelve-hour Phase I hearing, at which eleven witnesses testified. Based on this evidence, the Superintendent found that plaintiff had violated the Academy's sexual assault policy, SI 2016-

02—a Class I violation. During Phase II, the Superintendent heard testimony on behalf of plaintiff from seven people, including plaintiff. He deliberated over the weekend for Phase I and for approximately three hours for Phase II, weighing the evidence of plaintiff's good character against his misconduct, before pronouncing the punishment. Based on its independent review of the record, the Court concludes that the Superintendent followed the Academy's procedures and considered all of the evidence during both phases of the proceedings in arriving at his decisions, and there is simply no basis to conclude that his actions or decisions were arbitrary or capricious. Plaintiff has, therefore, failed to demonstrate a likelihood of success on the merits of the APA claim.

B. Constitutional Claims

Plaintiff also claims that the Hearing and his suspension violated the Fifth Amendment by depriving him of his substantive and procedural due process rights. (Compl. ¶¶ 145-61.) As set forth below, the Court concludes that plaintiff has failed to demonstrate a likelihood of success on the merits of these claims.

1. Procedural Due Process

a. Applicable Law

In order to assert a violation of procedural due process rights, a plaintiff must "first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Emps., UMD, ILA,*

---

too uh . . . intoxicated . . . . I just like reluctantly agreed I guess 'cause I mean . . . who is he . . . it was more like a who is he to judge someone's mental state of mind when he's been drinking even more?"); *id.* at 156 (Plaintiff disputes that Friend used the term "date rape," but acknowledges that Friend said, "Don't have sex with her. She's too intoxicated."); *id.* at 158

("[Superintendent]: O.K. and you had a friend who had arranged this date for you who told you she's too drunk. Don't have sex with her. I don't think any of that is in dispute right now. Is it? [Plaintiff]: It's not in dispute, but I would say the dispute would be the state of intoxication.").)

*AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (citation omitted). In the specific context of dismissal from the U.S. Merchant Marine Academy, in *Wasson*, the Second Circuit ruled that:

> [D]ue process only requires for the dismissal of a Cadet from the Merchant Marine Academy that he be given a fair hearing at which he is apprised of the charges against him and permitted a defense. It would be most unwise, if not impossible, for this Court to spell out in detail the specific components of a fair hearing in the context of expulsion from the Academy without the benefit of findings by a District Court because Regulations which appear harsh in the abstract to Judges more attuned to adversary civilian trials may prove entirely reasonable within the confines of Academy life. For the guidance of the parties, however, the rudiments of a fair hearing in broad outline are plain. The Cadet must be apprised of the specific charges against him. He must be given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence. We do not suggest, however, that the Cadet must be given this opportunity both when demerits are awarded and when dismissal is considered. The hearing may be procedurally informal and need not be adversarial.

382 F.2d at 812. Other Second Circuit cases have also made clear that the procedural due process requirements that exist in other settings may not be required in the context of school and military disciplinary proceedings. *See, e.g.*, *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972) (recognizing that due process procedures vary with context; for example, "[t]he right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings"); *Andrews*, 509 F.2d at 905 (explaining that the Academy's decision to dismiss a cadet or impose a separation would be "immune from constitutional infirmity" so long as the *Wasson* requirements were met).

### b. Analysis

Plaintiff argues that, to find a due process violation, the Court need only find that "due process has been violated in any one of a number of ways, or even . . . that the cumulative violations constitute a due process violation even if each individual procedure is constitutionally acceptable." (Pl. Mem. at 17.) Plaintiff highlights "several of the most egregious violations" of his right to due process: the lack of a fair and impartial decision-maker; the failure to apply the Academy's own definition of consent; the failure to abide by the Academy's own rules and regulations, including the right to cross-examine the accuser; and the "oppressive and unreasonable conditions" of the twelve-hour Hearing with limited breaks. (*Id.*) Defendants address each of these in turn, grouping the last two as the "conduct of the hearing." (Def. Mem. at 15-20.) Based on its review of the record, the Court agrees with defendants that plaintiff received the due process protections required in the context of this type of disciplinary proceeding.

### i. Impartial Decision-Maker

Plaintiff claims that he was denied the "fundamental due process requirement" of having an impartial decision-maker. (Pl. Mem. at 18 (citing *Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975)).) He argues that the Superintendent could not serve as an impartial "judge, . . . jury, . . . [and] appeals court" after prosecuting the case on behalf of the Academy. (*Id.* at 18.) He argues that to

believe, under those circumstances, that the Superintendent could have objectively decided the case "belies common sense." (*Id.*) Plaintiff points to the following examples of the Superintendent's bias in favor of the Academy: his failure to call the potential exculpatory witnesses, his "disparate treatment" of Complainant and plaintiff, and his misstatement of testimony as incorrectly suggesting that a witness had warned plaintiff that Complainant was intoxicated. (*Id.* at 18-19.)

As a threshold matter, the Court is not persuaded by plaintiff's argument that the Hearing was unconstitutional *per se* because the Superintendent *could not* have been impartial in light of his multiple roles. The Court disagrees, and concludes that the Superintendent's role as prosecutor, fact-finder, and appeals court was prescribed by Academy rules, and is permissible in light of precedent permitting such a combination of functions. The Academy's policies establish through the list of participants in the SA/SH Procedures, as well as Hearing procedures delineated therein and in the Midshipman Regulations, that the Superintendent shall serve in each of these roles. The SA/SH Procedures list of participants includes the Superintendent, parties, and witnesses (but no additional individual to serve as prosecutor or judge);[15] and its procedures indicate that the Superintendent (1) gives the introductory statement of the case and "may question any and all witnesses at the hearing," and (2) evaluates the facts, determines whether the respondent committed the charged violation, and issues a decision and penalty. (SA/SH Procedures at 1, 3-5.) The Midshipman Regulations provide for appeal to the Maritime Administrator *only where the penalty was disenrollment*, and for reconsideration by the

Superintendent in all other cases. (Midshipman Regulations at 12.) At the same time, SI 2016-02 includes among the rights of the accused and victim in sexual assault disciplinary proceedings: "[t]he right to an investigation and disciplinary process . . . [that] is *not conducted by individuals with a conflict of interest*." (SI 2016-02 at 6.) The fact that these policies coexist shows that the Academy has determined that there is no such *per se* conflict of interest as a result of the Superintendent's multiple roles.

Moreover, the Supreme Court and Second Circuit have rejected the argument that administrative hearings are unconstitutional *per se* because decision-makers who perform multiple roles cannot, as a matter of law, be impartial. In *Withrow v. Larkin*, the Supreme Court rejected the argument that a "combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias." 421 U.S. at 47. The board conducting the administrative hearing in *Withrow* had also conducted the investigation giving rise to the charges before it. *Id.* at 54-55; *see also Fuentes v. Roher*, 519 F.2d 379, 388 (2d Cir. 1975) (denying a plaintiff's due process claim where the administrative board "initiated the charges . . . , appointed a lawyer to prosecute them . . . , provided at least some of the evidence relevant to their determination, and will ultimately pass on the examiner's recommendation," and explaining that, "[i]n view of the holding in *Larkin*, we see little reason to question . . . the procedural fairness of the combination of functions performed by the school board"). The *Withrow* Court stated that, "[w]ithout a showing to the contrary, state administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of

---

[15] The Procedures list the following participants: the Superintendent (and counsel), Respondent (and

optional advisor and counsel), and any witnesses. (SA/SH Procedures at 1.)

its own circumstances.'" 421 U.S. at 55 (citation omitted). The Court likened administrative hearings to judicial review, noting that judges are not disqualified from presiding over a case due to earlier involvement in a variety of contexts. *Id.* at 56. The Court offered as examples probable cause determinations required to issue warrants in criminal cases and hearings in civil cases, and stated that "[n]either of these pretrial involvements has been thought to raise any constitutional barrier against the judge's presiding." *Id.* The Court emphasized, "[w]e should also remember that it is not contrary to due process to allow judges and administrators who have had their initial decisions reversed on appeal to confront and decide the same questions a second time around." *Id.* at 56-57.[16]

In *Wasson*, the Second Circuit ruled on this issue in the specific context of the Academy, finding that the combination of functions that a panel hearing a cadet's case had performed did not constitute a *per se* due process violation, but that a case-specific determination of impartiality was required:

> In substance Wasson charges that members of the panel which awarded the demerits had participated in the investigation against him. This combination of the functions of policeman and judge, he argues, resulted in a biased panel and, thus, the hearing was not fair. It is too clear to require argument or citation that a fair hearing presupposes an impartial trier of fact and that prior official involvement in a case renders impartiality most difficult to

maintain. In fact, the Regulations of the Academy prescribe this separation of functions. Of course the closeness of Academy life and the manpower limitations of a Regiment may at times make it unduly burdensome or impossible to secure a panel wholly lacking previous contact with the events in issue, yet the hearing must proceed. We think, however, that Wasson was entitled to show that members of the panel had had such prior contact with his case that they could be presumed to have been biased.

382 F.2d at 813. In short, the Court concludes that the Superintendent's combination of functions was not unconstitutional *per se*, and there is no evidence that he had any prior involvement in the investigation that would have eviscerated his impartiality.

Plaintiff urges this Court to look to the Sixth Circuit's recent decision in *Doe v. Miami University*, in which the court found the plaintiff had adequately alleged evidence of impartiality to support a due process claim. 882 F.3d 579, 601 (6th Cir. 2018). In *Miami University*, the plaintiff alleged that one of three school officials on his administrative hearing panel had served as investigator, prosecutor, and judge, dominated the hearing, and made remarks "designed to reduce [the plaintiff's] credibility while bolstering [his accuser's] credibility." *Id.* The Sixth Circuit found that this official's dominance "raise[d] legitimate concerns, as she was the only one of the three [panel members] with conflicting roles." *Id.* The

---

[16] To the extent that plaintiff specifically challenges the right to appeal the Superintendent's decision in any way, the Second Circuit has made clear that there is "no constitutional right to review or appeal after [a] disciplinary hearing which satisfied the essential requirements of due process." *Winnick*, 460 F.2d at

549 n.5; *see also Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 642 (6th Cir. 2005) ("Courts have consistently held that there is no right to an appeal from an academic disciplinary hearing that satisfies due process.").

court also noted the allegation that this official "announced during the hearing that 'I'll bet you do this [i.e., sexually assault women] all the time.'" *Id.* The court found that this statement suggested the official "had determined prior to the hearing that [the plaintiff] was responsible for the misconduct . . . and had a propensity for engaging in sexual misconduct." *Id.* The court, therefore, concluded that "although an [official's] dual roles do not per se disqualify him or her from being an impartial arbiter," the plaintiff had sufficiently alleged that the official's "ability to be impartial 'had been manifestly compromised'" to support a procedural due process claim. *Id.* (citation omitted).

In this case, plaintiff argues that the Superintendent showed similar bias to the official in the *Miami University* case. The Court disagrees. Plaintiff has failed to demonstrate a likelihood of success in showing that the Superintendent had a bias toward plaintiff that rendered him unable to perform his function as a fair and impartial decision-maker. First, plaintiff has not pointed to any of the Superintendent's remarks that would suggest a pre-conceived notion about plaintiff's responsibility for (or propensity to engage in) sexual misconduct, as in *Miami University*. Plaintiff claims that the Superintendent's conduct amounted to "disparate treatment" because he questioned plaintiff more vigorously than he questioned the victim. In the context of this particular proceeding, the Court does not believe that any differences in the tone or substance of the questions posed to plaintiff as compared to Complainant demonstrate an unconstitutional bias by the Superintendent. The Superintendent asked many questions of Complainant, including most of the written questions submitted by plaintiff. Moreover, plaintiff's other contentions regarding the Superintendent's questioning at the Hearing show only that the Superintendent considered the competing narratives before him, based on different witnesses' testimony over the course of the Hearing. Having carefully reviewed the Hearing, the Court does not believe plaintiff has put forth evidence that demonstrates that the Superintendent was biased. *See, e.g.*, *DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 492 (E.D.N.Y. 2009), *aff'd*, 623 F.3d 71 (2d Cir. 2010) (rejecting plaintiffs' argument that the "process was not valid because the school officials allegedly had made up their mind[s] before providing such process" because "plaintiffs provide[d] no evidence to support this conclusory assertion of bias"). Given that plaintiff has not overcome the "strong presumption that [the Superintendent] [is] impartial," *id.* at 492, the Court does not believe that plaintiff is likely to prevail on this ground with respect to the due process claim.

### ii. Notice of the Issue of Consent

Plaintiff also claims that the Academy failed to notify him of the charges against him in its Notice—in particular, of how plaintiff was alleged to have "sexually assaulted" Complainant. (Pl. Mem. at 19.) He also asserts that neither the applicable Superintendent Instruction nor the Midshipman Regulations prohibits engaging in sexual conduct with a person who has consumed alcohol. (*Id.*) Plaintiff acknowledges that SI 2016-02 prohibits sexual contact with a person one "reasonably should have known was impaired and, thus unable to consent, due to the use of alcohol," but argues that this rule (1) does not define impairment, and (2) later states that sexual contact is prohibited if the person would have been unable to consent due to intoxication *as*

a matter of law.[17] (*Id.* at 20 (citing SI 2016-02 (5)(e)).) Additionally, plaintiff argues that the following definition of sexual misconduct under Midshipman Regulations paragraph 243(a) is unconstitutionally vague: sexual acts "under circumstances that are discrediting to the Academy or the midshipman or are prejudicial to good order and discipline in the Regiment." (*Id.* at 19.)

The Court agrees with defendants that these Notices were constitutionally sufficient. Plaintiff recognizes that the Academy's policies included a definition of consent and, further, that they referenced intoxication in this context. The Court finds this more than adequate to alert plaintiff to the charges against him and the type of misconduct that would qualify as a violation of Academy rules. In short, plaintiff received adequate notice to constitute due process, as it has been articulated in the particular context of Academy hearings, discussed *supra*. *See Wasson*, 382 F.2d at 812 (In the context of the Academy, "due process only requires . . . that [the midshipman] be given a fair hearing at which he is apprised of the charges against him and permitted a defense.").

### iii. Conduct of the Hearing

Plaintiff identifies the following ways (among others) in which the Academy failed to abide by its own rules, by: refusing to provide plaintiff with an Executive Board Hearing rather than a Superintendent's Hearing; refusing to allow him to cross-examine Complainant; permitting Complainant and an advisor to sit in the Hearing room throughout the entirety of the proceedings; and waiting months to complete its investigation and file charges. (Pl. Mem. at 20.) Plaintiff also lists multiple objections to different aspects of the proceedings that,

together, he alleges amounted to "oppressive and unreasonable conditions." (*Id.* at 17, 20-21.) These include that the Superintendent: refused to provide breaks during the lengthy Hearing day; forced plaintiff to serve as his own attorney and testify on his own behalf; prevented plaintiff's counsel from participating and one of his attorneys from sitting in the Hearing room; precluded plaintiff from introducing favorable evidence based on law enforcement conversations, although such evidence was elicited from Complainant; refused to present exculpatory evidence and "instead requir[ed] plaintiff to do so, thereby shifting the burden to plaintiff to prove his innocence"; refused to allow plaintiff to inquire about Complainant's romantic relationship with the Friend; and refused to allow plaintiff to cross-examine the Friend about disputes between them. (*Id.* at 20-21.)

Defendants rebut these issues in turn, and the Court agrees with defendants' responses. Students are not entitled to representation at non-criminal proceedings. In *Crowley v. U.S. Merchant Marine Academy*, the court correctly noted that "courts generally have declined to recognize a right to representation by counsel, as a function of due process, in military academy disciplinary proceedings concerning non-criminal acts." 985 F. Supp. 292, 297 (E.D.N.Y. 1997). Here, the criminal investigation was closed before the Hearing began and, as the Academy correctly stated, plaintiff was charged with violations of the Academy's "policies, not . . . a criminal act." (Compl. ¶ 82.) Additionally, plaintiff *did* have an attorney present, who actively advised him both prior to and throughout the proceeding, directing him to specific prepared questions to ask witnesses and whispering advice to him. The fact that plaintiff was not allowed to have a second

---

[17] The rule states that: "Assent shall not constitute consent if it is given by a person who is unable to

lawfully give . . . her consent because of . . . intoxication." (SI 2016-02 at 3.)

attorney in the Hearing certainly does rise to the level of a due process violation.

The Court also agrees with defendants that plaintiff was not prejudiced by the length of the proceeding or the number or length of breaks.[18] The Hearing lasted from approximately 10:15 a.m. until 9:45 p.m. and included a lunch break, a dinner break, and other breaks throughout the day. Plaintiff was advised in advance that the Hearing could continue past business hours. The Court hardly finds these conditions to be "oppressive" or to rise to the level of a due process violation.

Moreover, the Court agrees with defendants' responses to plaintiff's evidentiary objections. First, the Superintendent did not undermine plaintiff's ability to present his case by limiting his time to give an opening or question Academy witnesses, or his right to call his own witnesses. Plaintiff argues that the Superintendent should have called exculpatory witnesses, but plaintiff had the opportunity to call any witnesses that he believed would support his defense (and did call such witnesses). Further, even in the context of a criminal prosecution, the

Superintendent would have satisfied his duty in identifying these witnesses that possessed this (potentially) exculpatory information. *See United States v. Bagley*, 473 U.S. 667, 678 (1985). Second, the Superintendent was within his right in declining to hear plaintiff's attorney's testimony as to interactions with law enforcement, where a law enforcement officer purportedly suggested that plaintiff was a credible witness. The Superintendent correctly stated that he was responsible for credibility determinations and, as such, that this evidence was not relevant. Third, the limitations during the cross-examination of the Friend do not raise any constitutional issues; rather, plaintiff engaged in extensive cross-examination of the Friend and was given the opportunity to undermine his credibility in a number of different ways. (*See, e.g.*, Tr. II at 11 (Friend drinks with underage women); *id.* at 17-21 (Friend had a friendship with Complainant after the Ring Dance, including going to softball game); *id.* at 23-24 (Friend had been drinking at the dance); *id.* at 35 (Friend had many infractions at the Academy); *id.* at 39 (Friend had received immunity from Academy for testimony).) Finally, the Court agrees that the Superintendent correctly precluded

---

[18] The Superintendent provided a lunch break and other short breaks throughout the day. (*See, e.g.*, Tr. I at 63-64 (Superintendent permits a 20-minute break before cross-examination of Complainant); *id.* at 85 (Superintendent takes break to allow follow-up written questions by plaintiff to Complainant); *id.* at 93 (Superintendent takes lunch break); *id.* at 139-41 (Superintendent takes break before cross-examination of Friend); Tr. II at 22 (short-break); *id.* at 59 (short break); *id.* at 129 (break before Superintendent questions plaintiff); *id.* at 175 (Superintendent allows break before closing statement).) Plaintiff claims that he was not permitted a dinner break, but the Superintendent states that he provided one, although the on-campus cafeteria was closed. Defendants argue that this is no fault of the Superintendent's, and plaintiff had been advised of the potential length of the proceeding and could have ascertained the cafeteria hours and other dinner options. In short, neither the length of the proceeding nor the number of breaks

created a due process issue. It is abundantly clear from the record that plaintiff was actively engaged in his defense throughout the proceeding. Although the Superintendent denied plaintiff breaks toward the end of his testimony at the end of the day, and plaintiff, on the recording, appears to be taking deep breaths at one point, there was nothing about that denial that impacted the fundamental fairness of the proceeding. Plaintiff had already testified to his version of the events in great detail, including in his opening, which was considered part of his testimony. (*Id.* at 177.) There was nothing about plaintiff's testimony or performance after the point where the break was denied that demonstrates that a lack of a break impacted his ability to participate in the proceeding in a meaningful way. His answers continued to be detailed and responsive. He was then given a break before his thorough closing statement. (*Id.* at 177-98.)

plaintiff from inquiring into Complainant's sexual activities. Not only does SI 2016-02 establish the victim's right to exclude prior sexual history in these hearings, but this Academy policy follows New York state's rape shield law. *See Grant v. Demskie*, 75 F. Supp. 2d 201, 209-10 (S.D.N.Y. 1999), *aff'd*, 234 F.3d 1262 (2d Cir. 2000) ("The purpose of New York's rape shield law is to prohibit cross-examination about a victim's sex life. . . . 'Rape shield laws serve the broad purpose of protecting the victims of rape from harassment and embarrassment in court, and by doing so seek to lessen women's historical unwillingness to report these crimes.'" (quoting *Agard v. Portuondo*, 117 F.3d 696, 703 (2d Cir. 1997), *rev'd on other grounds*, 529 U.S. 61 (2000))).

None of these or plaintiff's other objections to the Hearing procedures, either individually or cumulatively, amount to the types of deprivations of due process that would lead to a finding of an unconstitutional proceeding. As required, plaintiff was given a fair hearing, notice of the charges against him, and the opportunity to defend himself. *See Wasson*, 382 F.2d at 812. Further, he was given greater protections—to name a few, he had both a faculty advisor and an attorney that he consulted with throughout the proceeding, he had the opportunity to prepare questions for Complainant (as well as a set of follow-up questions), and, in determining plaintiff's penalty, the Superintendent heard testimony from five character witnesses and reviewed twenty-three statements in support of plaintiff. In sum, the Court concludes that plaintiff has failed to demonstrate a likelihood of success on his claim that he was deprived of his right to procedural due process.

## 2. Substantive Due Process

Plaintiff also brings a claim for a violation of substantive due process under the Fifth Amendment. The standard for such a claim under the Fifth Amendment is the same as for such a claim under the Fourteenth Amendment. *See, e.g.*, *Piechowicz v. United States*, 885 F.2d 1207, 1214 n.9 (4th Cir. 1989). The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment "does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable." *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005). Instead, the scope of substantive due process is very limited. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The Supreme Court has said that it is "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (citation omitted). Substantive due process is a means of "protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (citation omitted). "In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pena*, 432 F.3d at 112 (quoting *County of Sacramento v. Lewis*, 118 S. Ct. 1708, 1717 n.8 (1998)). To satisfy this standard, a plaintiff must show the government decision it challenges "was arbitrary or irrational or motivated by bad faith." *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989).

Plaintiff accurately states the standard for substantive due process claims, but fails to demonstrate how defendants' actions "shock the conscience," or to identify any actions that support this claim beyond the alleged procedural deficiencies discussed *supra*,

which the Court finds unpersuasive. Plaintiff makes the conclusory allegation that defendants' conduct "violat[ed] . . . the Academy's own rules, was arbitrary and capricious and did not involve the exercise of proper judgment," and "was motivated by bad faith or ill will." (Compl. ¶¶ 148-59.) Plaintiff claims that defendants "deliberately and prejudicially assumed Plaintiff's guilt, . . . rushed to judgment, . . . were intentionally dismissive of Plaintiff's statements and rights, and then overzealously punished Plaintiff to serve political purposes." (*Id.* ¶ 150.) As defendants argue, all of plaintiff's substantive claims are rooted in alleged procedural infirmities. The claims pertaining to defendants' motives—that they were motivated by ill will and political objectives—are unsupported by any concrete factual allegations.

The Court finds that, for the same reasons discussed with respect to plaintiff's procedural due process claim, plaintiff fails to show a likelihood of success on his claim that he was deprived of his right to substantive due process. Not only has plaintiff failed to prove these procedural deficiencies, but plaintiff's claims fall far short of the standard for substantive due process claims. As the Second Circuit explained in *Natale v. Town of Ridgefield*:

> Substantive due process is an outer limit on the legitimacy of governmental action. It does not forbid governmental actions that might fairly be deemed arbitrary or capricious . . . . Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.

170 F.3d 258, 263 (2d Cir. 1999) (citing *Lewis*, 118 S. Ct. at 1716 ("[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense."); and

*Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988) ("Only a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983.")).

## IV. CONCLUSION

For the foregoing reasons, the Court finds that plaintiff has failed to demonstrate a likelihood of success on the merits on any of his claims. The Court, therefore, need not consider whether plaintiff would suffer irreparable harm in the absence of a preliminary injunction. Plaintiff's motion for a preliminary injunction is denied.

SO ORDERED.

JOSEPH F. BIANCO
United States District Judge

Dated: April 20, 2018
Central Islip, NY

\* \* \*

Plaintiff is represented by Gerald B. Lefcourt, Faith A. Friedman, and Sheryl E. Reich of Gerald B. Lefcourt, P.C., 1841 Broadway, Suite 910, New York, New York 10023. Defendants are represented by Diane C. Leonardo-Beckmann and Megan Jeanette Freismuth of the United States Attorney's Office, 610 Federal Plaza, Central Islip, New York 11722.